## *SUPREME COURT OF JUDICATURE*

##### OF THE

## STATE OF NEW-YORK,

##### IN AUGUST TERM, IN THE THIRTY-FOURTH YEAR

##### OF OUR INDEPENDENCE.

---

### In the case of JOHN V. N. YATES.

ON the second day of the last *February* term, *Emmet* moved for a *habeas corpus* to bring up the body of *John V. N. Yates*, a prisoner in the custody of the sheriff

*Where a sheriff returned to a writ of habeas corpus, that he held the prisoner by virtue of* an order of the court of chancery, which order referred to a former attachment, setting forth the grounds of commitment, and from which the prisoner had been discharged by a judge of this court in vacation, on another *habeas corpus*, and the sheriff also returned the attachment and proceedings prior to the last order of commitment; it was held, that the sheriff could not return the true cause of caption, without also stating the original attachment and subsequent orders, and that the whole return might be received, and examined into by the court.

A discharge of a prisoner, committed by an order of the court of chancery, by a judge of this court, in vacation, on *habeas corpus*, is not conclusive, either upon the court of chancery, or this court; and the prisoner may, after such discharge, be again committed for the same cause.

Where *A. B.* who was a master in chancery, was committed by the chancellor, and the order of commitment stated that *A. B.* while he was master, filed a bill, to which he subscribed the name of *C. D.* one of the solicitors of the court, without his knowledge or consent, and prosecuted the cause in his name, " contrary to the statute in such case made and provided, in wilful violation of his duty as master, and in contempt of the authority of the court," and " for the said mal-practice and contempt," the said *A. B.* was ordered to be " committed to gaol, there to remain until the further order of the court." It was held that this was a legal and valid commitment for *a contempt*, even if the party might have been indicted for an offence against the statute concerning counsellors, solicitors and attornies. But whether it is an indictable offence within that statute, *quære.*

This court has no power to discharge a person committed by the court of chancery for a contempt; and it will presume that the proceedings of that court were legal, and that the conviction for the contempt was on sufficient and legal evidence.

A commitment, " until the further order of the court," is good.

of *Albany.* The motion was grounded on sundry affida-- vits which were read. ✻ ✻ ✻

*The Court* said, that as it was a matter of importance, they would take until the next day, at the opening of the court, to consider whether it was proper to grant the motion.

*Emmet* then prayed that the prisoner might be admitted to bail, in the mean time.

KENT, Ch. J. Until the party is actually before us, on a *habeas corpus,* we cannot admit to bail, and we do not think proper to allow the writ, without some consultation on the case.

The writ of *habeas corpus* having been allowed, on the following day, the prisoner was afterwards, (*Thursday,* the 9th *February,*) brought up, and the following return was made by the sheriff : That the prisoner was, on the 7th day of *February,* arrested by him, and in his custody, by virtue of an order of the court of chancery, made the 5th day of *December,* 1808, which states, that the court of chancery did, on the 20th day of *September* last, make another order, as follows, to wit : " Upon reading the order made in this matter on the 5th day of *September,* and the certificate of the sheriff, stating " that on the 12th *September,* he had arrested the defendant, and that by virtue of a writ of *habeas corpus,* Judge *Spencer* did, on the same day, discharge him on the ground, that the original cause of the caption was illegal, and that the taking and detaining him, for the same matter, ' was illegal and unwarrantable, and subversive of the liberties of the citizens ;' that as the commitment for the mal-practice and contempt, before adjudged by the court to have been committed by the defendant, has

not been remitted by the court, nor the said contempt purged, and the court deeming the discharge repugnant to the laws of this state, and void, *ordered* that the sheriff retake the defendant, and recommit him, for his contempt and mal-practice, as, in the attachment before issued, was commanded, there to remain, until the further order of the court ;" and the sheriff having returned to the said order of the 20th *September*, that the defendant was not found, it is, therefore, *ordered* that the sheriff retake the defendant, and recommit him for his contempt and mal-practice, &c. there to remain until the further order of the court."

<div style="float:right">ALBANY,<br>August, 1809.<br><br>Case of<br>J. V. N. Yates.</div>

The sheriff further certified, and returned to the *habeas corpus*, that the writ of attachment, referred to in the foregoing order, was dated the 17th *August*, and is as follows : " whereas, in and by a certain order of the court, on the 13th *June*, in the matter of complaint of *Samuel Bacon* against the defendant, it is set forth, that upon reading the affidavits of *Samuel Bacon*, *Peter W. Yates*, and *Richard S. Treat*, and upon fully considering the subject-matter thereof, it appeared satisfactorily to the court, that the defendant, during the time he was a master of the court, had filed a bill of complaint with *Richard S. Treat*, one of the clerks, in behalf of *Samuel Bacon*, complainant, against *Henry Garretse* and *Charles Morris*, as defendants, and thereto subscribed the name of *Peter W. Yates*, one of the solicitors of this court, without the knowledge or consent of the said *Peter W. Yates*, and had acted as a solicitor in the said cause, in the prosecution thereof, in the name of the said *Peter W. Yates*, contrary to the statute in that case made and provided, in wilful violation of his duty as master, and in contempt of the authority of this court ; it was therefore ordered by the court, among other things, that the defendant be committed, for his said mal-practice and contempt, to gaol, there to remain until the further order

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

of the court ; therefore the court commanded the sheriff' to attach the defendant, and convey him to gaol, there to remain until the further order of the court."

And the sheriff further certified, and returned, that the defendant was discharged, on a *habeas corpus*, by Mr. Justice *Spencer*, after being arrested on the said writ of attachment, on the 19th *August*, and the judge certified in his discharge, that, " it having been made satisfactorily to appear to him, that the said commitment was not for any contempt committed by the defendant, towards the said court, but that the same was for an alleged mal-practice, on the part of the defendant, as a master in chancery, in using the name of *Peter W. Yates*, as a solicitor, in a certain cause, without his consent, and in violation of the 9th section of the act, concerning counsellors, attornies and solicitors,* &c. he was of opinion, that the commitment was illegal and unprecedented."

24 Sess. c. 32.

The sheriff further certified, and returned, that the order of the 5th *September* was as follows : to wit, " upon reading and filing the attachment aforesaid, and the return thereon, stating the discharge aforesaid, and due deliberation having been had thereon, and the court deeming the said discharge repugnant to the laws of the state, legally inoperative and void, it is *ordered* that the sheriff retake the defendant, and recommit him for his contempt and mal-practice, as in the said attachment he was commanded, there to remain until the further order of the court."

The sheriff further certified, and returned, that the defendant was taken on the said order, and again discharged by Mr. Justice *Spencer*, on a *habeas corpus*, on the 12th *September*, who certified, in his discharge, as follows, to wit : " it appearing that the defendant has been again taken and imprisoned, for the same matter and cause, whereon he was imprisoned, when discharged on

*habeas corpus*, on the 19th *August*, I am of opinion, not only that the original cause of the caption of the defendant was illegal, but that the taking and detaining him on the said order was illegal and unwarrantable, and subversive of the liberties of the citizens ;" and he therefore discharged him.

The sheriff also certified and returned, that, after the last discharge, by Mr. Justice *Spencer*, the order first above mentioned, was received by him, by virtue of which order he took the defendant, on the 7th day of *February*, inst. and still detains him in his custody, &c.

After the return was read, the *Chief Justice* observed, that there were many matters stated by the sheriff, which related to proceedings prior to the commitment on which the prisoner was now brought up, by the *habeas corpus*, and it might be a question, whether the papers, as to such previous proceedings, were to be filed, or rejected as surplusage.

*Emmet* said, that as this was the return of the officer, the only question was, whether the return was sufficient. Leave is sometimes given to amend a return, but he thought no part of it could be struck out, or rejected as surplusage. Besides, as there was a reference in the last order of commitment to the previous proceedings, it was highly proper, if not necessary, to set out the whole proceedings in the return.

After some conversation, it was agreed, that the return should be filed as it stood, and the motion for the discharge of the prisoner be heard, on the merits, reserving the question as to striking out, or rejecting any part of the return, to be decided afterwards. The whole return was accordingly filed, and the counsel, for the prisoner, moved that he should be discharged.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

*Jacob's Law
Dictionary,(At-
tachment.)

†24 Sess. c. 65.
3 vol. Laws, 286.

‡ 31 Car. II. c. 2.

*Emmet.* [*Champlin*(a) also argued in support of the motion.] I shall first examine the return as relates to the last order of commitment only. It is bad, on the face of it. It is an *order*, not a *writ* or *warrant*. It is a mere rule of court, directed to an officer, who is not bound to obey it. An officer cannot take a person into custody, except by a *writ* issued by the court. In fact, this *order* refers to an original writ of attachment. Where there is an offence, in the face of the court, yet, if the offender goes out of court, before he is taken on an order, he can, afterwards, be taken only by writ.* The highest authority is requisite to deprive a person of his liberty. It must emanate from the court, having cognisance of the offence. There can be no execution executed, except by *writ*. In no case will a mere *order* justify the retaking of a person, although the original taking was by writ ; but there must be an *alias* writ, or writ of recaption. The first writ was returned, and so was *functus officio*. It could not be revived or renewed by an order ; but a new writ was requisite to retake the prisoner.

Another objection is, that a person who had been discharged on a *habeas corpus*, has been taken into custody, a second time, for the same offence, in violation of the *habeas corpus* act.† This raises the question, how far Mr. Justice *Spencer* was authorised to investigate the ground of the commitment. There is some difference in the words used in our act, and in the *English habeas corpus* act.‡ The language of the former is, " if any person be imprisoned as aforesaid, in vacation time, it shall be lawful," &c. In the latter, the words are, " if any person shall be or stand committed or detained for any crime."—A bill having been brought into the *English*

(a) It has not been thought requisite to give his argument separately ; *Emmet* took a more extensive view of the subject, and, to avoid repetition, I have endeavoured to report the whole as one entire argument, and as fully as possible. *R.*

parliament, the opinion of the twelve judges was taken, whether a judge, in vacation, could issue a *habeas corpus*, and they were of opinion that he could not, unless the party was committed *for a crime.* Our act, in reference, no doubt, to that decision, generalizes the law, omitting the words, " for any crime." What, then, is the operation of the *habeas corpus* act, on the power of a judge, in vacation ? Most clearly, that of giving, except for the purpose of bailing a traitor or felon, to a single judge, in vacation, a power co-extensive with that of this court, in term time. If, then, this court has the power now to inquire into the grounds of the commitment, it follows, that a judge, in vacation, has the same power. The exception is, " other than persons convict or in execution by legal process, or committed for treason or felony, plainly and specially expressed in the warrant of commitment." Who is to decide on the legality of the process? The judge. To prove that the discharge was improper, it must be shown, that Mr. *Yates* was confined by legal process. Then what was the process ? If the last order of commitment ; it is defective in not showing that the first process was legal ; but it does not even set forth that process.

Then, will a discharge by this court, under a *habeas corpus*, prevent a person's being taken, and imprisoned a second time, for the same offence ? The 5th section of the act declares, " That no person who shall be set at large upon any *habeas corpus*, shall be again imprisoned for the same offence, unless by the legal order or process of the court wherein he is bound by recognisance to appear, or other court having jurisdiction of the cause." These words are explained by the 3d section, which directs the judge " to discharge the prisoner, on taking his recognisance, &c. for his appearance at the next court where the offence is properly recognisable."—" Unless it shall appear to the judge, that such prisoner is de-

tained upon a legal process out of some court having jurisdiction of criminal matters, or by some warrant under the hand and seal of a judge, or justice, for some matter or offence for which, by law, the prisoner is not bailable."

The only mode in which a person once discharged on a *habeas corpus*, can be again taken, is by the process of the court to whom the recognisance is returned, or by a court having criminal jurisdiction, or by a warrant under the hand and seal of a judge, or justice, for a matter or offence not bailable.

Whether the discharge by the judge was erroneous or not, can make no difference, if he had competent authority to discharge in the case. And a person once discharged by competent authority, can never be again taken, unless in the cases excepted in the act.

Another objection is to the generality of the terms of this commitment. It is for mal-practice, and contempt, without specifying in what the mal-practice and contempt consisted. A commitment for a contempt generally, or for treason or felony, is bad ; for the court, on the return, are to judge whether there be a contempt, treason, or felony. In the *Earl of Shaftsbury's case** the same objection was made to the return to the *habeas corpus*, and though the court decided that they had no jurisdiction, yet they had no doubt that the return was illegal and bad. Sir *Thomas Jones* said, " such a return, made by an ordinary court of justice, would have been ill and uncertain ; but that they ought not to judge of any law, custom or usage of parliament." All the cases where a general return has been supported, have arisen under a commitment by order of parliament, and, where the court would not take upon themselves to know or decide on the law of parliament. But the rule on this subject applies to a commitment by the court of chancery. For this court has the power to inquire into and decide on commit-

* 1 *Mod.* 144.
*Vaugh.* 14.   2
*Inst.* 52, 53. 55.
6 *Roll.* 218.
*Moore,* 839.

ments by the chancellor, who has equal power also to inquire into commitments by this court.* This is necessary, in order to preserve the liberties of the citizen. Unless the court, then, examine into the original attachment, referred to in the last order, we must avail ourselves of the objection to the generality of the return.

I shall now proceed to examine the original warrant of commitment, which, if it is not to be considered as a part of the return, may yet be taken into view, as matter *aliunde*, appearing from affidavits. There are three objections to this commitment, arising on the return.

1. That the matter laid to the prisoner's charge is a *crime*, prohibited by the statute, and, therefore, as such, is not at all cognisable in the court of chancery, which has no criminal jurisdiction ; nor is it punishable any where by an attachment for a contempt.

2. That the conviction is founded upon evidence which the law does not hold sufficient to warrant a conviction, even for a contempt.

3. That the imprisonment being in *execution* on *conviction*, should be *definite* and *terminable*, either by effluxion of time, or on the doing of some act by the prisoner : and cannot be uncertain and indefinite, as until the further order of the *authority* inflicting it.

1. In discussing the first objection, it is necessary, for the sake of the argument, to admit the truth of the facts ; but this admission is merely technical, because we are not, in this course of the proceedings, permitted to deny or disprove them.

By referring to the words of the order for the commitment, it will be seen, that there are many particular facts charged, the whole of which constitute *one offence.* After reciting the particulars, it is ordered, that the prisoner be committed " for the said mal-practice and contempt." The whole of the facts form *one mal-practice,*

ALBANY, August, 1809.

Case of J. V. N. Yates.

* D. Groenvelt's case, 1 Ld. Raym. 213.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

which, because it was a mal-practice, is also a contempt. For, on the face of the allegations, it is manifest, that nothing was done by the prisoner which, in itself, directly, was a contempt; but it was so, collaterally, and only because it was a mal-practice. If the word " therefore" be inserted in the antecedent sentence, after the word " and," and before the words " in contempt," it will be seen that the contempt was no more than a matter of inference from the misconduct. This one offence, or mal-practice, is characterized, as being contrary to the statute, in wilful violation of his duty, as a master, and therefore, in contempt of the court ; and, as the circumstance which constituted the criminality intended to be punished, it is set forth that the prisoner did the acts, specified in the order, " during the time he was a master of the said court."

The facts alleged have no reference to any nonfeasance or misconduct in regard to acts which he was required and bound to perform, as *master*. The words, " in wilful violation of his duty as master," have, therefore, no truth, unless those acts were a violation of his duty, *because* they were contrary to the statute. The result of the whole allegation is this : The prisoner, by doing certain acts, during the time he was a master of the court of chancery, was guilty of mal-practice, or an offence against the statute, and, therefore, in contempt of the authority of the court.

The 9th section of the statute* concerning counsellors, attornies and solicitors, prohibits masters from acting as counsellors or solicitors in any action or matter in the same court ; and the 6th section enacts, " That if any counsellor, attorney or solicitor, be guilty of any manner of deceit or collusion, or consenting thereto, whereby to deceive the court or the party, he shall be punished by fine and imprisonment."†

* 24 Sess. c. 32. Laws, vol. 1. 219.

† See 1 Com. Dig. Attorney, (A. 14.)

In consequence of its having been made an indictable offence, it ceased to be cognisable in the court of chancery, which has no criminal jurisdiction. That court can, undoubtedly, commit for contempts. It is its ordinary process for compelling appearance, answers, and obedience to its decrees.

ALBANY, August, 1809.

Case of J. V. N. Yates.

In the case of *Crosby*,[*] Lord Ch. J. *De Grey*, when deciding in favour of the right of the house of commons to commit, and that the court could not interfere, says, " As for the case of the chancery committing for crimes, that is a different thing, because the chancery has no criminal jurisdiction." In truth, this objection is peculiarly applicable to that court where only one judge presides.

[*] 3 *Wils.* 188

But in no court is a criminal matter, which is plainly and obviously the subject of indictment, punishable as a contempt, except a *rescue*, and a breach of the peace, *in facie curiæ*, both of which are direct contempts against the power of the court, in which the criminal matter is merged, if it may be so said, in the atrocity of the contempt.

There is no doubt that a party may be indicted as well as attached for a *rescue*. There are some anomalies relative to the cases of rescue, which it is not requisite to take notice of here. Suppose a rescue of a person in custody on a charge of felony, is the rescuer to be proceeded against by attachment? In civil cases there must be a return of the rescue before an attachment will issue.[†] A return of a rescue is a *conviction* on record, and no attachment can issue until a return, or conviction on record, which is not traversable.[‡] In the case of *Rex* v. *Philips and others*,[§] it was decided, that as the return of a rescue amounted to a conviction, the attachment was in nature of an execution, or *capias pro fine*, and therefore the party could not be allowed to enter into recognisance, to answer interrogatories on such an attachment. A re-

[†] *Sheather* v. *Holt*, 1 *Str.* 551. 6 *Mod.* 144.

[‡] 6 *Bac. Abr. Rescue*, (3.) *Cases temp. Hardw.* 112. Y. B. *Hen.* VII. 21. pl. 5.

[§] *Barnes*, 429, 430.

cognisance may be allowed, until the action of the party against the sheriff for a false return has been tried.

In the case of a contempt, *in facie curiæ*, the court is authorised, on its own view of the transaction, to make a record of conviction, and inflict a peculiar penalty, which a mere breach of the peace, in the same degree, would never warrant. So, for an indecent disturbance in the face of the court, it inflicts a fine and imprisonment, which the same disturbance, in any other place, would not justify. As in the case of the *King* v. *Stone*,[*] when the jury had acquitted Mr. *Stone*, a person present threw up his hat, and hallooed ; he was taken into custody and fined 20 pounds. But cases of both these kinds have three characteristics ; 1. They are direct contempts of the power of the court. 2. The enormity of the contempt merges the crime. 3. There is no necessity to establish the truth of the fact by the intervention of the jury. The loss of a trial by jury is no injury to the offender, for as there is no *accusation*, there can be no *plea*, or *denial* of the fact. The whole of the record is a *conviction*, on view, for matters of which the court have *judicial cognisance*, the highest certainty of the law.

*6 Term Rep. 550.

Setting aside, however, those cases, principle, as well as authority, opposes the summary punishment by attachment, as for a constructive contempt, of indictable offences. In every case of such an offence, the accused is entitled to the intervention of a grand and petit jury, secured to him by the constitution, and laws of the land.

The constitution of the *United States*, (Art. 3. s. 2.) says, " the trial of all crimes, except in cases of impeachment, shall be by jury." The constitution of this state, (art. 41.) says, " Trial by jury, in all cases in which it hath heretofore been used in the colony of *New-York*, shall be established, and remain inviolate

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

forever." And the act concerning the rights of the citizens of this state, declares, " that no citizen of this state shall be taken, or imprisoned, for any offence, upon *petition* or *suggestion*, unless it be by indictment, or presentment of good and lawful men of the same neighbourhood where such deeds be done, in due manner, or by due process of law."—Attachment is on a *suggestion*. (See 1 *Bac. Abr.* 282. *Attachment.* 1 *Com. Dig. Attachment.*) The clause in the act last cited, does not interfere with convictions on view, or on return of a *rescue*, already mentioned, nor does this act prohibit attachments, except for *offences*. Besides, could the prisoner plead his imprisonment under this warrant, in bar of his being tried for the same offence by indictment? How had he the benefit of the 6th article of the amendment of the constitution of the *United States*, which says, *inter alia*, that in all criminal prosecutions the accused shall have compulsory process for obtaining witnesses in his favour.

These, or similar reasons, have established the same principles in *England.* In *Hawk. P. C.* b. 2. c. 22. (vol. 3. pp. 280. 285.) the various cases are laid down in which jurors may be attached and fined, but in s. 21. and s. 22. certain cases are stated in which, he thinks, they may be fined, *unless an attaint lies against them ;* and in s. 23. he says, " if a jury shall refuse to find an office for the king, upon full evidence, it hath been holden, that they may be fined, for that, in such case, they are not liable to an attaint." Now, an *attaint* is the ancient criminal mode of prosecuting a jury for certain misconduct, and the meaning of all those passages, taken together, is, that jurors may be attached for such misconduct as does not subject them to be proceeded against regularly, by criminal prosecution ; but that they cannot be attached for such misbehaviour as renders them liable to be prosecuted criminally.

*1 *Str.* 531.

† *Ibid.* 384.

In the Gaoler of *Shrewsbury's* case,* an attachment was moved for against him, for a voluntary escape of one in execution for obstructing an excise officer in the execution of his office ; but the court refused to grant it, there being no precedent for that purpose ; they, however, ordered him to show cause why there should not be an information. In an *anonymous* case, in the same book,† two people put in bail, in feigned names, and, because there were no such persons, they could not be prosecuted for personating bail, on the statute of *Jac.* I. c. 26. So the court ordered them and the attorney to be set in the pillory.

If we compare the act for regulating attornies, &c. with somewhat of a correspondent statute in *England*, it may lead to the opinion, that the *English* legislature were aware that the passing of such a law would take away the power of attaching, unless specially reserved. By the 22 *Geo.* II. c. 46. s. 2. if any attorney, or solicitor, should act as agent for a person not qualified, &c. " and complaint be made thereof, in a summary way, to the court from whence such process did issue, and proof made thereof, upon oath, to the satisfaction of the court, then every such attorney, or solicitor, so offending, shall be struck off the roll," &c. " and upon such complaint and proof, the court may commit such unqualified person, so practising, to the prison of the said court, for a time not exceeding one year." Thus, in *England*, when the legislature interfered in a similar case, it expressly gave the power of proceeding summarily, and committing the unqualified person that practised ; which our act does not.

‡ 1 *Com. Dig.*
*Attachment*,
(A. 3.)

Baron *Comyns*,‡ in mentioning what is not a contempt, lays it down, that an attachment will not be granted, where there is another remedy, unless that remedy be difficult to obtain. By this he undoubtedly means a civil remedy, where discretion may be exercised. As in the

case of *Hanslow and wife* v. *Roberts and others*,* a motion was made by *Chapple*, for an attachment against *Constable*, for acting as an attorney, without being sworn; and the court denied making any rule, as a penalty of 50 pounds was laid on the defendant, by act of parliament. And in *Stock* v. *Huggins and another*,† on a motion for an attachment in disobeying an award, the plaintiff having brought an action of debt on the award itself, the court refused to grant the attachment; for as the court would not deliver the party from the attachment, until he had paid the money, the plaintiff would have two remedies, at the same time, for the same purpose.

This principle prevents the case of *Oppenheim, qui tam,* v. *Harrison*,‡ and *Thistlethwaite's* case,§ from being applicable; for the acts, in those cases, would be indictable, under our statute, as a *deceit* practised to "deceive the court."

Again, where part of the act, or offence, is out of the jurisdiction of the court of chancery, the party cannot be proceeded against by attachment; but if the different facts stated in the *order*, as constituting the mal-practice complained of, could be separated, so as to consider each as independent of the others, still the same principle of law would apply, for each of them is indictable under the act : and if so split up, still the punishment is entire, and could it be pleaded in bar, when the chancellor had no jurisdiction? Where a conviction is bad in part, it is bad in *toto*, and the court will discharge a prisoner imprisoned under a judgment, part of which is illegal.¶

2. The conviction is founded on the affidavits of *Samuel Bacon, P. W. Yates*, and *Richard S. Treat*, and on no other evidence. This is not the course of the court of chancery, nor of any court known to our constitution, nor is it the law in case of a contempt. A party accused has, in most cases, a right to contest a rule to

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

* *Barnes*, 27.

† *Rep. temp. Hardw.* 106.

‡ *Burr.* 20.
§ 1 *Com. Dig.*
576, 594. (A. 2.)
(*Kyd's* ed.)

¶ *Rex* v. *Collyer,*
*Sayer,* 44.

show cause by his own affidavit. It is in the discretion of the court to issue an attachment or not ; but if an attachment issues, it is no more than *process* to bring in the party, to answer to the accusation. He is then either committed, or allowed to enter into recognisance to answer interrogatories, which must be exhibited in a certain time, and on which he is to be examined. This examination is referred to the proper officer, to report thereon whether the party be in contempt. In the courts of law, if the party denies the charge, he is discharged. In chancery, his oath may be contested by the accuser, but still he must be examined on interrogatories, and the master report him to be in contempt. He cannot be *judged*, until the interrogatories have been exhibited.* In the case of *Rex* v. *Edwards* and *Symonds*,† the court say, " the attachment is to bring them into court to answer to interrogatories to be exhibited. There is nothing to plead guilty to, until the interrogatories are filed : Neither are they in contempt until *reported* so. There is nothing appearing to the court, at present, whereupon to ground a judgment or fine, or any punishment." In that case the defendants had come in, and applied to be admitted to acknowledge the contempt.

As the interrogatories are, therefore, essential, in every case, to the conviction, it should appear that they have been exhibited, and that the judgment of the court has been founded on a due consideration of them. It appears, by the return, that the conviction was on the affidavits which have been mentioned. Nothing is said of any interrogatories having been administered. But the court have power to examine into this fact, *aliunde*, for it does not falsify or contradict the return, but merely explains it. Though you cannot falsify a return, yet affidavits are allowable, as to any matters a knowledge

* *Wyat's Pract. Reg.* 135, 136.
1 *Bac. Abr.* 286. *Attachment*, (B).
4 *Bl. Com.* 286, 287. 2 *Burr.* 796, 797.
† 4 *Burr.* 2106.
5 *Term Rep.* 562.

of which would enable the court to decide, whether the prisoner ought to be remanded, bailed or discharged.*

3. The imprisonment in this case is in execution on conviction ; and yet it is until the further order of the court. At first blush, this seems contrary to all principle. Commitments before judgment, might, perhaps, be allowed until further order, though even that is not legal ; but after the extent of the crime is ascertained, justice and the rights of the citizen require that the sentence which the law pronounces, through the organ of the judge, should be definite and certain. This, most certainly, is an elementary truth in the ordinary cases of criminal jurisprudence.

*Hawkins* states what ought to be the conclusion of a commitment. The words " to be kept till further order," are sufficient, because they shall be intended of the order of law ; " but a commitment till the person who makes it shall take further order, seems not to be good."† " The warrant, or mittimus, containing a lawful cause, ought to have a lawful conclusion ; viz. and him safely keep until he be delivered by law, &c. and not until the party committing doth further order."‡ In *Addis's* case,§ this objection was taken. The gaoler returned to the *habeas corpus* " that *Addis* was committed to his custody, by warrant from the Lord Chancellor of *England*, for certain matters concerning the king, there to remain until the Lord Chancellor delivered him." *Hutton*, serjeant, objected to the return, as too general, not showing for what cause he was committed, and because he was to remain in confinement until delivered by the chancellor ; and although for the first objection, if not for the other, the return was bad, yet the judges answered it was the first time that such objections had been taken, and they would, therefore, consider of the case, of which nothing further is heard.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

* 3 *Hawk. P. C.*
224. b. 2. c. 15.
s. 79. *Str.* 1138.
*Caldec.* 295.. 5
*Mod.* 323. 454,
455. 2 *Jones,*
222. 1 *Sid.* 287;
288. 1 *Roll.*
*Rep.* 337.

† 3 *Hawk. P. C.*
237. b. 2. c. 16.
s. 18.

‡2 *Inst.* 591,592.
§ *Cro. Jac.* 219.

ALBANY,
August, 1809.

Case of
J. V. N Yates.

* Cro. Car. 401.
557.

† Ibid. 418. 579.

§ 1 Lev. 230.

§ 1 Roll. Rep.
415. 3 Bulstr.
48. 54.

In the case of *Seales* and others,* the same objection. was renewed. *Grimstone*, objected to the return in that case, that it was ill to award to prison to remain until further order taken, which is utterly uncertain. A day was given until the octave of St. *Michael*, and in the mean time the prisoners were bailed, but we hear no more of the case. Again, in *Freeman's* case,† both the objections which have been stated were made, and the king's counsel seemed to have abandoned it, and elected to proceed by indictment and information.

In *Parker's* case,‡ the commitment was " till further order," simply. The court held the return good in that point ; but they agreed that a commitment until further order of the person committing, was not good ; but until further order generally, is all one as by further order of law. This objection, indeed, seems to have been overruled in *Holt* and *Dighton's* case.§ These men had been committed by the high commission court, and liberated once before on *habeas corpus*, with direction to repair to the high commission court, and make submission. They went accordingly, but refused to answer whether they were willing to take the sacrament kneeling, for which they were committed till the further order of the court. On a second *habeas corpus*, the court, probably, tired of them, not willing to embroil itself with the high commission court, and wishing to get rid of such incorrigible schismatics, refused to bail, or discharge, though this objection was made. Different reasons are assigned in *Rolle* and *Bulstrode*, but neither of them apply to this case. In *Rolle*, the judges say, " the high commission courts have jurisdiction of heresies and schisms, and, therefore, good jurisdiction, and we do not know whether this be not their customary mode of proceeding." In *Bulstrode*, Ch. J. *Coke* justifies it, because, he says, " many times the parties are committed, *donec* the business *discussus fuerit*."

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

As to the first reason, this court does know, and in this case, in this country, is bound not only to know the customary mode of proceeding in chancery, but to examine whether it be conformable to the settled rules established for securing personal liberty. The argument also implies that such a commitment would not be good, according to the rules of law with which the judges were acquainted. The second reason, (that it was a commitment, until the business should be discussed,) however bad, is inapplicable to the present case, where the business has been discussed, and the imprisonment is a punishment. Indeed, in most of the cases to be found, the commitment was on *mesne* process, but if it be bad on *mesne* process, *a fortiori*, it must be bad in execution. Allowing a court to commit until the further order of the court, would give it the power of doing indirectly what it could not do directly. Such a sentence, or order, is indefinite and arbitrary.

Such sentences are, however, not without precedent. Most of the books of chancery practice mention the power of committing for contempt, during pleasure, which is tantamount to a commitment, until the further order of the court; and they all refer to the *Practical Register*,\* as their authority. " For any direct and positive contempt, a party may not only be taken into custody but committed to the *Fleet*, during the pleasure of the court." The author speaks of direct and positive contempts, such as the present case is not ; but in support of his position, he, in his turn, cites *West's Symbologra-phy*, under the title of *Proceedings in Chancery*, s. 32.† The passage in *West* is this : " The proceeding in this court is by the said writs, and by orders, injunctions and decrees, which if the defendant resist, his punishment for this resistance, and for his contempt in not appearing, is imprisonment in the prison of the *Fleet*, *as is said*, during the Lord Chancellor or the Lord Keeper their pleasure, or until he will obey and perform the order and

* Wyatt's Prac. Reg. 134.

† West's Symb. 2d part, 185. b.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

decree of the same court." Thus speaking only of the direct contempts against process, and, at the same time, expressing a doubt as to the imprisonment during pleasure ; but, at any rate, coupling it with a limitation that would always enable a party, by his own act, to put an end to his imprisonment. *West*, for his authority, cites * 37 *Hen.*VI. 13, the *Year Books*,* but, on recurring to them, there is not a 14. and 39 *Hen.* VI. 26. word to be found of imprisonment during pleasure, but only until the defendant shall do certain acts. In 37 *Hen.* VI. c. 14. it is laid down by *Prisot*, Ch. J. their power is to make the party deliver up an obligation, &c. and nothing more, except commit him to prison till he does it : and that is all the court can do ; if the party will lie in prison, rather than give up the obligation, the other is without remedy.

The court of chancery, therefore, does not appear to have any peculiar power of committing during pleasure, or till its further order ; but it may be said that the common law courts claim this power in the case of contempts. They do so ; and this case must decide their powers, as well as that of the court of chancery ; but if the opinion of *Black* † 4 *Bl.Com.* 286. *stone*† be correct, the mode of proceeding by attachment seems to have been derived to the courts of *K.B.* and *C.P.* through the medium of the court of equity, and it is important to inquire on what foundation it stood in that court. Indeed, the most learned lawyers have been embarrassed to give any colour of law to such a power in the courts ‡*Gilb. Hist.Com.* of common law. Chief Baron *Gilbert*‡ derives the origin *Pleas,* 25. of commitment for contempt from the statute of *Westminster* 2. c. 39. which enables the sheriff, when the king's writs are resisted, to take the *posse comitatus*, and to chastise the offenders by imprisonment, from which they should not be delivered, without the special command of the king : and he says, that since the sheriff had that power, the judges who awarded such process must have the same authority to vindicate it. If that be the

foundation of such authority, it can only extend, even in England, to contempt of process, as the *Practical Register* lays it down; and it cannot at all extend to this country, where sheriffs never had any such power. *Blackstone** thinks the process of attachment, or power of summary punishment, must necessarily be as old as the courts of justice, and inseparable, by necessity, from them. As far as that necessity extends, I admit the doctrine; but no necessity requires *imprisonment during pleasure.* If the offence be completed, its degree of enormity can be ascertained, and there can be no reason why its punishment should not also be ascertained. If the contempt consists in refusing to carry into execution what is required, the commitment may be *till the party perform it.* I am inclined, to think, however, that the claim of imprisoning during pleasure, is derived from a source perfectly inapplicable to our form of government, the *royal prerogative*, that is, when it was, in early ages, paramount to the liberties of the people, and from the supposed presence of the king in his courts :—the illegality of the claim has remained unexplored, because the power has not been abused. I am confirmed in this opinion from the commitment by the house of lords, in the *Earl of Shaftsbury's* case,† which was, " during his majesty's pleasure, and the pleasure of the house."

<div style="text-align: right">ALBANY,<br>August, 1809.<br>Case of<br>J. V. N. Yates.<br><br>* 4 Bl. Com. 286.<br><br><br><br><br><br><br><br><br><br><br><br><br><br>† 1 Mod. 144.</div>

[KENT, Ch. J. But is not every commitment at pleasure, or without limitation, always understood to be until submission, and is it not in the power of the party to put an end to his imprisonment by submission ?]

This power of arbitrary imprisonment is against the genius of our government, and the principles of civil liberty. There is no principle to support such a sentence, except necessity, and I have shown there can be no such necessity, for every possible end of justice, vindicatory

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

* 4 Bl. Com. 283.

and coercive, may be attained without it, and every case of contempt provided for. There is nothing in the nature of an attachment to warrant such a vague and uncertain punishment. *Blackstone** justly classes them with summary convictions ; but in what respect do summary convictions differ from more regular proceedings ? In the *process* and the *proofs*. Their being summary renders them peculiarly serviceable, as ancillary to the courts ; but the proceedings being finished, and the conviction once had, there is nothing in the nature of summary convictions to authorise a more informal or arbitrary, and, eventually, a severer and more oppressive sentence, than could be pronounced in the more regular and estimable course of proceeding.

In the present case, if for the same offence, after an indictment by a grand jury, and a trial by a petit jury, the prisoner had been found guilty, and the same sentence pronounced upon him, he might bring a writ of error, to set it aside. Why should he, then, be without any remedy against the same sentence, following on proceedings which the law and the community regard with more suspicion ? And is it in the power of any court, at its option, for an indictable offence, to deprive the accused, without his consent and against his interest, of all these valuable privileges, the protection of a grand and petit jury, compulsory process for witnesses to testify in his favour, a certain and ascertained punishment, and the benefit of a court of error, or of any other mode of being relieved from a judgment which no court could by law be authorised to pronounce on the offence, if it had been made the subject of an indictment ?

*Cur. ad. vult.*

The court taking time to advise, the prisoner was bailed to appear at the next term. At the last *May* term, at the desire of his counsel, the court deferred giving their opinion, until the present term, when the prisoner was further recognised to appear.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

YATES, J.   It is undoubtedly essential to the due administration of justice, that all courts should have power sufficient to enforce obedience to their own orders ; hence the necessity of authorising them to punish contempts, a power resulting from the first principles of judicial establishments, in the constitutional exercise of which they ought to be protected.

How far this power has been constitutionally exercised, by the court of chancery, in the case now before us, is the subject of the present inquiry.

I shall not enter into a minute discussion as to the legality of the imprisonment of Mr. *Yates*, under the provisions contained in the fifth section of the act, entitled " an act to prevent unjust imprisonment by securing the benefit of the writ of *habeas corpus*," on the last order of the court of chancery, after a regular discharge by a judge.   But the exercise of this power, I think, is not warranted by the exceptions stated in that statute, whereby the right of again imprisoning for the same offence is expressly prohibited, " unless by the legal order or process of the court wherein he is bound by recognisance to, appear, or other court having jurisdiction of the cause ;" clearly meaning such court wherein the prisoner may have been subsequently indicted or charged with a criminal offence.   The act, consequently, cannot apply to the court of chancery which has no cognisance of such matters, more especially in this instance, where its own acts were implicated, and had been passed upon by a judge acting (in my view of the subject) under the express directions of a positive statute ; but as this last order expressly refers to the first commitment, I shall, for the purpose of a more satisfactory investigation, proceed to examine into the validity of the original attachment, appearing on the face of the return now before us.

In the attachment it is stated, that upon reading the affidavits of *Samuel Bacon*, *Peter W. Yates*, and *Richard*

*S. Treat*, and upon fully considering the subject matter thereof, it satisfactorily appeared to the court of chancery, that *John V. N. Yates*, during the time he was a master of the said court, had filed a bill of complaint with *Richard S. Treat*, Esq. one of the clerks of the said court, in behalf of *Samuel Bacon*, as complainant, against *H. Garretse* and *C. Morris*, defendants, and thereto subscribed the name of *Peter W. Yates*, one of the solicitors of the said court, as solicitor, without the knowledge or consent of the said *Peter W. Yates*, contrary to the statute in that case made and provided, in wilful violation of his duty as master, and in contempt of the authority of said court; it was therefore ordered, by the said court, that the said *John V. N. Yates* be committed for his said mal-practice and contempt, to the common gaol of the city and county of *Albany*, &c.

Having thus the return before us, the first inquiry will be as to the nature of the offence of which Mr. *Yates* was convicted; this can be ascertained only from the specification in the attachment.

I am inclined to think, if it had been generally for a contempt, no other court could legally interfere, although authorities have been adduced in support of a contrary doctrine.

In the present case, the court of chancery has stated the conviction to be for a breach of an existing statute, and, consequently, for an indictable offence. After particularly mentioning the nature of this offence, the words in the commitment are, *contrary to the statute in that case made and provided, in wilful violation of his duty as master, and in contempt of the authority of the court;* those allegations clearly indicate a violation of the statute only, the words in contempt of the authority of the court not entering into or composing the essence of the offence, but being merely words of aggravation; according to the most consistent interpretation I can give to the attachment,

which if correct, the result must be that the court of chancery have undertaken to punish for a crime, an offence against the statute, and, consequently, not within its jurisdiction. The proceedings against Mr. *Yates*, therefore, must be void, being *coram non judice*, and his discharge by the judge, when brought before him on the *habeas corpus*, was proper.

This is not the case of a court of a co-ordinate jurisdiction reviewing the act of its fellow, nor of an inferior controlling the acts of a superior jurisdiction. All courts, as I before stated, have a right to punish for contempts, but all courts have not a right to punish for crimes: the court of chancery is of this last description; the process in this case was not within its jurisdiction, but went to punish for a violation of a statute; and this is within the admission of Ld. Ch. J. *De Grey*, who explicitly declares, in the case of the *Lord Mayor of London*, "that if the chancery commits for crimes, it is a different thing from a commitment for contempt."

But admitting that, by the specification in the attachment, the court of chancery intended to include the infraction of the statute, and the contempt, it then follows, that both offences have entered into the measure of the punishment inflicted, and that Mr. *Yates* stands committed for the mal-practice, in wilfully violating his duty as master contrary to the statute, on this summary conviction, without the benefit of a constitutional trial to test the verity of the charge ; and also for the contempt ; the indictable offence for an infraction of the statute being without, and the contempt within, the power of the court ;—a manifest inconsistency, yet the only explanation to be given to the specification in the attachment, different from the first construction which I have made.

It may be said that this court will not presume that the court of chancery contemplated the exercise of an illegal or

usurped authority, and that, therefore, the specification of the crime as against the statute, ought not to be taken into view, but should be rejected as surplusage ; and that we ought to consider ourselves bound, from the high respectability of that court, to intend the punishment to be for the contempt only, and thus reconcile and determine the question of jurisdiction. To this I can never assent : in a question like the present, involving principles so highly interesting to the community, no other construction or interpretation, in my opinion, is admissible, than such a one as the entire specification of the offence in the attachment will warrant. A different doctrine, according to my view of the subject, might expose a citizen to be punished twice for the same offence, and in its consequences, in other respects, endanger the most important coustitutional privileges. The prisoner ought therefore to be discharged.

SPENCER, J. The consideration of this case involves questions of the utmost delicacy and importance. On the one hand are presented the conflicting opinions of the chancellor and a judge of this court, on the other the personal rights of a citizen of the state, holding important and honourable offices under it. My situation renders the task of examining and pronouncing upon the question extremely irksome and unpleasant : but I have no choice ; my station imposes the duty on me, and I will not shrink from its performance. It will be readily admitted that in reviewing a question which has been passed upon by one of the highest judicial characters in the state, a question, too, involving a right to exercise a jurisdiction claimed by that character, there ought to be a liberal courtesy ; it should not, however, be indulged so far as to lead to a surrender of the prerogatives of another judicial department, nor to the demolition of personal liberty. With these impressions, I enter, reluc-

tantly, on the questions now before the court. It is not,
however, my purpose to examine the various points
which have been raised ; I shall consider only two of
them.

1st. Whether the commitment of Mr. *Yates*, after he
had been discharged upon *habeas corpus*, for the same
cause, was a legal act ? and,

2d. Whether he was originally committed for matter
whereof the court of chancery had cognisance ; and, if
so, whether that commitment was legal ?

1. The statute " to prevent unjust imprisonment, by se-
curing the benefit of the writ of *habeas corpus*," requires
of the judges of this court, in vacation, to allow the writ
of *habeas corpus* to all persons in custody of a sheriff,
gaoler or other person, " other than persons convict, or
in execution by legal process, or committed for treason
or felony, plainly and specially expressed in the warrant
of commitment ;" and it also requires of the judge to
" discharge the prisoner on taking his recognisance with
sureties, for his appearance at the next court where the
offence is properly cognisable," &c. " *Unless it shall
appear* to such judge, that such prisoner is detained
upon a legal process, out of some court having jurisdic-
tion of criminal matters, or by some warrant under the
hand and seal of a judge, or justice, for some matter or
offence for which, by law, the prisoner is not bailable."
It cannot be controverted that a judge of this court, in
vacation, is, by virtue of this statute, clothed with all the
power, in granting the writ and discharging from impri-
sonment, which the supreme court itself can exercise, in
term time. In the cases excepted from the cognisance of
a single judge, and where the offence is not bailable, the
court itself would not discharge, unless in the single
case of extreme illness of the prisoner, and where an en-
largement was necessary to preserve his life. This ap-
pears to me so self-evident a proposition, as to stand in
no need of arguments to enforce it.

It being, then, the duty of a judge of this court, in vaca: tion, to grant the writ to all persons in custody, excepting to such as are convict, or in execution by legal process, who is to decide whether the person applying for the writ comes within the exception ? Undeniably, the judge ; for as he is to grant the writ to all others in custody, should any person applying for the allowance of a *habeas corpus*, be illegally convict, or in execution by illegal process, such person cannot be denied the benefits secured by the statute.

If cases were necessary to support a proposi‑ tion deemed so clear, that of the *King* v. *Collyer* and *Capon** will be found in point. The defendants were convicted at a quarter sessions, upon an indictment for assaulting one *Smith*, and by the order of the court they were committed to prison, for the space of one month next ensuing, and to ask pardon, on their knees, of *Smith*, and to cause an account of the sentence to be printed in the *Daily Advertiser*, and not to be discharged until they had undergone such imprisonment, asked such pardon, and caused such account to be published, and, when dis‑ charged, to pay certain fees. The defendants were brought up, by *habeas corpus*, before the court of king's bench, and when the above facts appeared on the return to the writ, the defendants were discharged. The court said that every part of this judgment was illegal except the imprisonment, and it would be very hard that the defendants should continue in prison under the illegal ·parts of the judgment, until they could obtain a reversal of those parts upon a writ of error. It is to be re‑ marked, that in the case cited, no pretence was made that the court of quarter sessions had no jurisdiction ; the only ground on which the court of king's bench inter‑ posed, was, that the conviction itself was illegal.

If, then, a single judge of this court, in vacation, pos‑ sesses the same power which the court in term pos‑

* *Sayer*, 44. 26 *Geo.* II.

sesses, here is a direct precedent for saying that a single judge, in vacation, has a right to judge of the legality of a conviction, and if he does adjudge it illegal, to discharge the person suffering imprisonment under it.

Mr. *Yates* having been committed by a process issuing from the court of chancery, wherein was set forth the offences of which he had been convicted, was discharged by me, on a *habeas corpus*, on the 19th of *August* last, in which discharge I judicially pronounced the conviction, and imprisonment under it, to be illegal. The court of chancery again imprisoned him for the first offence, adjudging my discharge illegal, null and inoperative. He was a second time discharged by me, on the ground of the illegality of the first conviction, and on the further ground that he could not be reimprisoned for the same cause, and he is now a third time imprisoned for the same matter. It naturally occurs, whence the court of chancery acquired a jurisdiction to take cognisance of the legality of my adjudication upon Mr. *Yates's* conviction by that court. I think I have shown that I had cognisance of the legality of the conviction by the court of chancery; and, at present, it is utterly immaterial whether my adjudication was erroneous or not. I had a right to make that adjudication by virtue of the *habeas corpus* act. I am unacquainted with any law, or decision, which gives to the court of chancery a power to supervise the judgments of this court, or of one of its judges, in a case where a judge has a power co-extensive with that of the court, and to set aside such judgment as illegal, null and inoperative. It is true, the court of chancery can relieve after a judgment at law, but such relief can be for some matter only, extrinsic the judgment; it cannot reverse the judgment, but in all respects must consider it right, but for the extrinsic facts of which it presumes the court did not take cognisance. In my view of the subject, the power of the court of chancery was spent,

so far forth as respects the infliction of any further punishment on Mr. *Yates* for the offence of which he had been convicted; it could interpose only by mitigating the punishment of imprisonment, which it had adjudged should continue till the further order of the court.

It seems to me a prostration of all principle, and a perfect anomaly in the law, that a subject upon the legality of which, the legislature has authorised a judge of this court, in vacation, to adjudge and determine, and on which, in the exercise of this plenary power, he does adjudge and determine, that this judgment shall be liable to a review, and to be set aside, *in a summary manner*, as illegal, null and inoperative, by any other *forum* whatever. The legislature have conferred no power on any other court to reverse such decision, and the only mode in which, in other cases, judgments can be reversed, is by regular process in some superior court designated by law.

This case presents still greater incongruity; the same court whose conviction had been adjudged illegal, and after the matter had become *res judicata*, undertakes, of its own accord, and in a very concise manner, to reverse the judgment thus judicially pronounced, and to reinstate its own conviction. I cannot bring myself to believe that the *habeas corpus* act, which, at the epoch of its introduction in *England*, and ever since, has been revered as the bulwark of the constitution, the *magna charta* of personal rights, and which has been successfully exerted against commitments, even by the king in council, is liable to the construction which has been put upon it; a construction which would defeat and mow down those very rights, and that freedom from illegal personal restraints, which it was introduced to uphold and protect.

I therefore deny to the court of chancery, or any other court, the right to reimprison a person convicted, when the conviction has subsequently been declared illegal, and the party imprisoned has been set at large on

*habeas corpus.* Arguments may be urged from the pos= sible abuse of this power, and from the exercise of it by a single judge, against carrying the principles I have advanced so far ; but it ought not to be forgotten that any other power, and that all delegated authority is liable to be abused ; but this is no reason against conferring it, nor against its exercise ; those who are guilty of abuses are amenable to their superiors.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

I have hitherto proceeded on principles drawn from analogy between this and other cases of judicial deci- sions, and, I trust, have shown that the mode adopted by the court of chancery, in setting aside my decision, is altogether novel and incongruous, destitute of precedent, and dangerous, in the extreme, to the liberties of the citizens. I shall now proceed to show that the power exercised by the court of chancery is expressly forbidden by statute.

The 5th section of the *habeas corpus* act declares " that no person who shall be set at large upon any *habeas corpus*, shall be again imprisoned for the same offence, unless by the legal order or process of the court wherein he is bound by recognisance to appear, *or other court having jurisdiction of the cause.*" To ar= rive at a true construction of this section, it must be no- ticed that by the third section of the act, the judge, in discharging a prisoner, is required to take a recognisance for his appearance at the next court, where the offence is properly cognisable, *which* court, by the terms of the 5th section, may, by legal process or order, again imprison him, for the same offence ; and upon this obvious prin- ciple, that inasmuch as the prisoner, who was charged with an offence, had been enlarged, during the vacation of the court, when it came to sit, it was deemed fit to vest a discretion in the court, to recommit for the same offence, in order that the prisoner might be forthcoming to abide a trial. Such power was considered necessary to attain the ends of criminal justice ; and it can be ex=

ercised only in the manner, and for the purposes already mentioned. The court of chancery, I must presume, has considered the words " or other court having jurisdiction of the cause," as applicable to itself; and that having had jurisdiction of Mr. *Yates's cause*, it could reimprison him, notwithstanding his discharge upon *habeas corpus*. I cannot assent to the soundness of this construction, and if it be adopted, it appears to me, that the *habeas corpus* act, becomes almost, if not altogether, a dead letter. What, upon the principle assumed, would prevent a justice of the peace, who had committed a person for trial, from reimprisoning him? He has jurisdiction of the cause for the purpose of imprisoning; his power was no more spent by committing, than that of the court of chancery in the present case, by its conviction and subsequent commitment in execution. The justice had jurisdiction, and so had the court of chancery; in the one case it was exhausted and gone, by the commitment to stand trial; and in the other, by the conviction and commitment in execution.

The terms " or other court having jurisdiction of the cause," must be referred to the preceding member of the section, which, as I have before stated, relates to persons whom the judge, on enlarging upon *habeas corpus*, had bound by recognisance, to appear at the next court, where the offence is properly cognisable; and then that court at which he was bound to appear, or other court having jurisdiction of the *cause*, for which he was bound to appear, may imprison for the offence, upon the charge on which he had been set at large on *habeas corpus*. By adverting to our criminal system, the explication of this provision will appear very plainly. In every county of the state, there are two courts of criminal jurisdiction; a court of *oyer* and *terminer* and gaol delivery, and a court of general sessions of the peace; the former has jurisdiction of offences, committed within the county for

which it is held, of whatever degree ; the latter of all offences, other than those affecting life, or imprisonment in the state prison for life.   The judge in taking a recognisance, when he discharges on *habeas corpus*, is at liberty to bind the prisoner to appear at the one or the other of these courts, as he sees fit, having regard to the periods when they are to sit, and their right to take cognisance of the offence.   If the prisoner is bound to appear at a court of general sessions, and it happens that a court of *oyer* and *terminer* is held in that county, prior to the time when the prisoner has been bound to appear, and it should also happen, that an indictment is presented to such court of *oyer* and *terminer*, against the person thus enlarged, then that court would gain jurisdiction *of the cause*, for which the prisoner was bound by recognisance to appear, and it might, having thus acquired jurisdiction, by legal process or order, commit the individual.

This appears to me the only natural exposition of the power given by the legislature, to commit persons once delivered on *habeas corpus*, for the same cause. But for what purpose did the court of chancery regain jurisdiction of Mr. *Yates's* cause, if it be not a perversion of terms, to call it a cause ?  Certainly, not for the purpose of investigating the guilt or innocence of the party, but merely to reverse a decision judicially interposed, under the notion that it had higher powers, than those conferred by the legislature, on a judge of this court.   To support a construction, which appears to me to be so monstrous, the words " or other court having jurisdiction of the cause," are to be insulated, without having reference to the subject just before presented, of a person bound by recognisance, which words evidently point to a person, whose guilt had not been ascertained, and who was yet to stand trial for the offence imputed to him.     In the present case, the offence had been examined, and

conviction had taken place, which must be considered illegal, because it had been so adjudged, unless indeed the committing court had a right to reverse it.

The legislature have not only forbidden the reimprisoning a person, set at large upon *habeas corpus*, for the same offence, with the exceptions, on which I have commented, but have superadded a penalty of 1,250 dollars, on any person who shall knowingly, contrary to the statute, recommit, or imprison the person set at large, for the same offence. It may be imagined that if the penalty has not been incurred in the present case, then the recommitment is valid and legal. I dissent from such a proposition; it by no means follows, that if the penalty has not attached, that therefore the recommitment is allowed by the statute. The force of such an argument must depend on this, that a court is not a person; and that a court cannot be responsible, *civiliter*, for its acts. In the case of a single magistrate's recommitting for the same offence, the act would be done under the semblance of a judicial authority, and it may as well be insisted that a magistrate would not be responsible. Without intending to express a decided opinion, whether the penalty has attached in the present case, I would observe, that there are cases, in which if a court shall presume to intermeddle, clearly without jurisdiction, the acts done under such usurped authority, are not the acts of a court, but of the persons composing it, and they have been held personally responsible. My opinion on the first question I proposed to examine, is, that whether Mr. *Yates* was rightfully discharged or not, upon the *habeas corpus*, his reimprisonment for the same offence, was unwarranted by law, and he is now entitled to his discharge.

2. It is, in my view, immaterial to consider the propriety of my discharge, but the occasion seems to require some attention to it, and I shall, therefore, briefly review it. I humbly conceive that it can form no objection to the

exercise of the power conferred by statute, that the deprivation of personal liberty which has intervened, comes from the court of chancery. If that court has illegally imprisoned a citizen, and it shall so appear to me, while I sustain the office I hold, I cannot withhold the exercise of those functions which the law has given me, in affording a remedy. An upright and an independent judge cannot balance between his personal inclination and his duty.

I shall now consider, 1st. For what offence Mr. *Yates* was committed; 2d. Whether if the conviction partakes of some matters cognisable by the court of chancery, and of some of which it has no jurisdiction, there was a just cause of deliverance on *habeas corpus*. In considering these points, I shall regard the attachment only, without admitting or denying the right of examining evidence *aliunde*. When Mr. *Yates* was brought before me, I examined collateral evidence, in conformity to what I understand to have been a very usual practice with the judges of this court. By examining *aliunde*, I do not mean the admission of evidence, contradicting the return, but explanatory of it. I forbear that examination on the present occasion, being satisfied that the opinion of his honour the chancellor, delivered when the first attachment was awarded, will not materially aid in ascertaining the cause of the commitment.

The offence imputed to Mr. *Yates* is, *that during the time he was a master of the court of chancery*, he had filed a bill in a cause, and thereto subscribed the name of *Peter W. Yates* as solicitor, without his knowledge or consent, and had acted as a solicitor in his name, in the prosecution thereof, *contrary to the statute in such case made and provided, in wilful violation of his duty as master*, and in contempt of the authority of the court; and he was committed until further order, *for his said mal-practice and contempt.* It appears to me, that there are two distinct

offences; 1st. For having filed a bill, in the name of a so-licitor of the court, and as an aggravation thereto, having done so without his consent; and, 2d. That at the time when this act was done, Mr. *Yates* was a master in chancery, and that the act thus done was consequently contrary to the statute, and in wilful violation of his duty, as a master. For the first offence, the court could undoubtedly proceed as for a constructive contempt: with respect to the latter, in my opinion, the court had no jurisdiction.

There is no statute prohibiting the use of a solicitor's name, by another person, though there is a prohibition in the case of an attorney.* There is a statutory inhibition to a master of the court of chancery, against acting as solicitor in any action or matter in that court; hence there cannot remain a doubt that the violation of the statute ascribed to Mr. *Yates*, consists in his having filed the bill in the name of a solicitor, during the time he was master.

*1 vol. R. L. 221. 24 sess. c. 32. s. 7.*

It is an elementary principle, that where an act is done contrary to the provisions of a statute forbidding it, an indictment will lie, unless the legislature prescribes a specific forfeiture. I forbear to give any opinion whether the act done by Mr. *Yates*, exposed him to an indictment. The court of chancery has proceeded on the principle that he had violated the statute; if so he certainly was indictable. What puts this matter beyond all controversy is, that Mr. *Yates* is committed " for his said mal-practice and contempt." This could not mean that as solicitor of that court, he had been guilty of mal-practice, for it no where appears that he was a solicitor of the court; it can have reference to nothing else, than that as a master of the court, he had wilfully done an act contrary to the statute, and in wilful violation of his duty, because it was contrary to the statute. It follows, that the court of chancery has undertaken to punish a master of that court, whose commission is derived from the

council of appointment, for his mal-practice, in violating a statute, for which, if the statute has been violated, there exists, in a court of competent jurisdiction only, a power of punishing the individual.

This leads to the inquiry whether the court of chancery possesses criminal jurisdiction. I believe it only necessary to state, that it has not that jurisdiction. The organization of that court, its proceeding according to the civil law, without the power of convening a grand or petit jury, renders its exercise of criminal jurisdiction incompatible with every idea of personal safety or liberty.

That relief can be afforded by *habeas corpus* where the conviction contains some good and some bad matter, the case of the *King* v. *Collyer* and *Capon*, already cited, shows. The only difference between that cause and this, is, that here one of the grounds of the conviction is out of the jurisdiction of the court, and there it had jurisdiction of the whole complaint, but made an illegal sentence. The effect on the individuals is the same in both cases; the one suffered for a matter of which the court had not cognisance, the other for an excess of authority in the judgment. But it cannot be intended that the court of chancery, would have inflicted the same punishment for a constructive contempt only, which it would for a contempt and also for a wilful violation of a statute by a public officer, contrary to his duty. That both matters entered into the judgment of the court, is manifest to my mind, because both are carefully recited, and he is committed for both. How then can they be separated, and the court of chancery be presumed to act on one, when it professes to act on both? It appears to me as absurd to uphold a conviction founded upon good and bad matter, when the punishment is awarded on both, as it would be to support a judgment at law, founded upon distinct matters, some of which were actionable, whilst others were not.

It has been intimated, that the court of chancery is a court of such high jurisdiction, that it was incompetent for a judge of this court, either to intermeddle with its process, or question the legality of its proceedings. With all due deference for such an opinion, I cannot subscribe to it. In every case arising upon *habeas corpus*, it would seem to me, that the sole inquiry ought to be, is the prisoner legally or illegally in custody, and not what court committed him. I am warranted in this position by the opinion of chief justice *Tilghman*, in *Olmstead's* case ; Mrs. *Sergeant* was brought before him on *habeas corpus*, and it was insisted by the counsel for *Olmstead*, that she was not entitled to her discharge, even if the judge was of opinion that the district court by which she was committed, had no jurisdiction. He declared his opinion to be, that in the case supposed, he would have a right, and it would be his duty to discharge the prisoner.

On these principles, if the cause was before me, anew, and separated from the question of recommitment, I should pronounce the conviction bad, and that the prisoner was entitled to his discharge.

KENT, Ch. J. The return to the *habeas corpus* has imposed upon the court, the necessity of discussing and deciding some interesting questions. We are called to examine into the validity of the commitment of the court of chancery, into the authority of a judge of this court, to interfere, in vacation, upon *habeas corpus*, and to set aside such commitment. It is also made a question, whether the act of the judge, be not, at all events, conclusive upon the subject matter of the commitment. This inquiry is, in every view, important, and I shall endeavour to acquit myself of my public duty, by bestowing upon the case, a free, full and diligent investigation.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

A preliminary question was raised, and reserved upon the argument, which must be disposed of, before we enter upon the consideration of the merits.

The sheriff returns, not only the order of the court of chancery, of the 5th of *December*, by virtue of which he took, and now holds the prisoner; but the order of the 5th of *September*, upon which the prisoner was retaken, after the first discharge by the judge, and also the attachment of the 17th of *August*, upon which the prisoner was originally committed.

Unless the attachment is to be received as part of the return, we cannot examine into the legality of the original commitment, nor into the legality of the discharge of the prisoner by the judge. The counsel for the prisoner have contended, that the whole return ought to be received, as pertinent, and in order. The last order does not specify in what the contempt and mal-practice therein mentioned, consisted but it refers to the writ of attachment, as containing the true cause of the commitment. This order declares the discharge by the judge, to have been illegal and void, and it evidently considers, that the prisoner ought to be reclaimed, by virtue of the attachment, and that the recommitment is to be sustained upon that original process. If the discharge was null and void, this construction was correct, and the prisoner is in, as from the first commitment. The sheriff could not, then, return the true cause of the caption, and detention of the prisoner, without stating the attachment, as well as the subsequent orders; and I am accordingly of opinion, that the whole return ought to be received.

1. The first point raised by the counsel for the prisoner is, whether the discharge of the judge be not conclusive and final, so as to preclude the court of chancery, from examining into the correctness of the discharge, and from recommitting the prisoner for the same cause.

The *habeas corpus* act, among the exceptions, states those of " persons convict, and in execution by legal process" as being entirely out of the purview of the third section, under the authority of which the *habeas corpus* was awarded. And if the prisoner, when he was discharged, was a person answering to either of those descriptions, the judge had no authority to bail or discharge him, and he ought to have been immediately remanded. If such a prisoner should be discharged, the discharge cannot be binding or valid, for this would be placing power without law, upon the same foundation with power exercised according to law. A proceeding without jurisdiction, is void, and a mere nullity. The judge in this case, derived all his authority from the statute, and that does not apply, and of course does not make his discharge binding, if the prisoner came within one of the exceptions stated.

The 5th section of the act which prohibits reimprisonment, for the same offences, of persons discharged upon *habeas corpus*, most evidently applies only to cases in which the writ and discharge were had, pursuant to the statute. And even this prohibition extends only to magistrates acting individually, in vacation, and does not extend to any *court* having jurisdiction of the cause of the commitment. Such courts are expressly excepted from the prohibition, and of course retain the same powers as before the passing of the statute. If, then, the attachment had in itself been so defective, as not to have been sufficient to have held the prisoner, the court of chancery might still have awarded a new and competent warrant of commitment, for the same cause, for which the first warrant issued, provided the case was one of which that court had jurisdiction.

In *Alphonso's* case, (2 *Bulstr.* 259.) the court of king's bench admitted that this might be done. He was committed by the college of physicians, for practising physic, and was brought into the king's bench,

ALBANY,
August, 1809.

Cree of
J. V. N. Yates.

upon *habeas corpus;* and all the court held the return insufficient, as no cause for the commitment was stated. But they agreed, that, " if they should discharge him, for the insufficiency of the return; then the college would presently take him again, and commit him, and ·then would amend their return, and make it better."

It was the decision of a majority of the judges who gave their opinions, to the house of lords, in 1757, on several questions relative to writs of *habeas corpus,* that at common law, and before the statute of 31 *Charles* II. no judge could regularly issue a writ of *habeas corpus,* in vacation; and even now, under the statute, the judge has no means to enforce obedience to the writ, but by referring the case to the court, out of which the process is supposed to issue. It would then be extremely incongruous and singular, if the act of a judge in vacation, which he has not authority to execute, was to have the force and effect of a final judgment, pronounced in the last resort, and conclude all other jurisdictions within the state. Such a power would be dangerous as well as unprecedented. A single judge of this court might, in that case, annul the decision of the rest of the court, by discharging, in vacation, a person committed by the judgment of the court. A power of this extent would ride over all the courts of the land, and become perfectly despotic, if it was not subject to review and correction. There is no trace of its existence, to be met with in the books, and the only colourable ground for the conclusiveness of the discharge of a prisoner, upon *habeas corpus,* is the provision contained in the 5th *sec.* of the *habeas corpus* act; and that provision, as we have seen, is limited to cases properly arising under the act, and in no respect extends to courts of competent jurisdiction.

There are numerous instances, in which the court of K. B. and some cases, in which the court of C. B. has,

upon *habeas corpus*, undertaken to examine, and decide upon the cause and the authority for the commitment by another court. But in all those cases, the *habeas corpus* was awarded by *the Court*, and returnable therein ; and except, in a few anomalous cases, in the time of *James* I. and of which I shall take notice hereafter, the examination into the authority of the court to commit, arose upon commitments by some inferior court. (12. *Co. Chancey's* case. 1 *Roll. Rep.* 245. *Codde's* case. *Cro. Car.* 567. *Crawley's* case. 2 *Bulst.* 139. *Hodges* v. Mayor of *Liskarett. Styles*, 90. *Smith's* case. *Vaug.* 135. *Bushell's* case. 1 *Salk.* 348. *Bethell's* case. 1 Ld. *Raym.* 99. *Bracy's* case. 1 Ld. *Raym.* 213. *Groenvelt's* case. 1 Ld. *Raym.* 545. *King* v. *Chandler. Stra.* 794. *King* v. *Elwell. Sayer*, 44. *King* v. *Collyer* and *Capon.*) They were all cases of *habeas corpus*, at common law ; and I apprehend, that there is not an instance in the *English* law, of a judge in vacation, undertaking to decide upon the legality of a commitment in execution, by the judgment of any court of record, and much less, of a court of the highest degree.

The powers granted by the *habeas corpus* act, to a judge in vacation, were never intended to apply in any such case, because, cases of that kind appear to be carefully excepted in the statute ; and it was not requisite to include them, for the purpose of guarding against arbitrary and groundless imprisonment. The statute seems, with a studied precaution, to have declared that the powers granted to a judge in vacation time, were not to affect cases of imprisonment, under the authority of a competent court. In the first place, " *persons convict, and persons in execution by legal process*," are not to apply to a judge, for the allowance of a writ of *habeas corpus*. In the second place, a judge is not to discharge the prisoner brought before him, if it appears that he is detained *upon any legal process, out of a court having jurisdiction of criminal matters.*" And lastly, if

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

the prisoner be set at large, the prohibition to reimprison him, for the same offence, does not extend to any " *court having jurisdiction of the cause.*" It appears to me, to be unfit, and dangerous to the orderly administration of the law, for a single judge, in vacation, to be charged with a summary and plenary power of review of the judgments and executions of a regular court of justice. The abuse of the powers of the established courts, was never, in any period of our law, so grievous, as to require such a prompt control. And, perhaps, as much, and more danger was to be apprehended from the abuse of such a remedy, than from the abuse of the original power.

The uniform practice, under the statute of *Charles* II. appears to have coincided with the construction which I adopt; and which strikes my mind, as founded on the strongest principles. This settled practice ought to govern and conclude us; for our *habeas corpus* act is almost a literal transcript of the statute of *Charles.* The act of 1787 followed the *English* statute, *verbatim*, and the revised act of 1807, made only some slight abbreviations in the mode of expression, which cannot, without violence, be construed to alter, in the least degree, the sense and settled construction of the former act. That the " mere change of phraseology," in the revised laws, was not to work a change in the established interpretation, was the unanimous decision of the court for the correction of errors, in 1805, in the case of *Taylor* v. *Delancy.* (2 *Caines's* cases in error, 150, 151.)

There seems to be a degree of propriety and consistency in a superior court of appellate jurisdiction taking cognisance, upon the return of a writ of *habeas corpus*, of the legality of a judgment and commitment, in an inferior court: But for a single judge to possess such a power, to be exercised in vacation, in a summary manner, without argument of counsel, and upon the judgment and

commitment of any and of every court in the state, would be an alarming innovation upon our judicial system.

If, therefore, upon the return of a writ of *habeas corpus*, awarded in vacation, it appears, that the prisoner stands committed, by the judgment of a court of record, or other court of competent authority, the judge is bound, immediately, to remand the prisoner; and he has no power to examine and decide, touching the legality of the judgment, or the jurisdiction of the court. These questions belong to the cognisance of this court, as possessing general appellate powers, and as having the supreme control of all inferior courts.

The relief granted upon *habeas corpus*, against defective convictions and commitments, is, in some respects, analogous to the relief obtained upon a writ of error. It is, in one respect, more desirable, because it is more prompt in relieving the prisoner from imprisonment, but, on the other hand, it leaves the order, or judgment of the court below, in full force, and only discharges the party from the present effect of it. Before *Bushell's* case, no person was ever delivered by *habeas corpus*, or without a writ of error, from commitments by a court of *oyer* and *terminer;* and, since that time, the courts will not, unless the judgment or commitment be manifestly bad in substance, relieve on *habeas corpus*, but put the party to his writ of error. (*Bethell's* case, 1 *Salk.* 348. and *King* v. *Collyer* and *Capon, Sayer,* 44.)

My opinion, on the first point raised in this case, accordingly is, that the discharge which took place in the vacation, was in no respect conclusive, either upon the court of chancery, or upon this court; and I am also of opinion, that, if the first commitment was good, the recommitment was equally lawful, for that the discharge was unauthorised and void, inasmuch as it was not in a case within the provision of the *habeas corpus* act, and because a judge in vacation, has no authority, either under the act, or without it, to review, and set aside, as

illegal and void, a formal commitment and conviction, by a court of chancery.

I shall next proceed to examine the merits of the present application, as appearing upon that part of the return, which sets forth the original warrant of commitment, and as unconnected with any thing which took place subsequent to the first execution of the attachment. The case is now to be considered, as if this was the first writ of *habeas corpus*, which had been sued out by the prisoner.

The counsel for the prisoner, submitted to the court three objections to the legality of the original warrant of commitment, and they contended, that upon either of the grounds, the commitment was illegal, and that the prisoner ought to be discharged. I shall examine these several objections in their order.

1. It is said, that the matter laid to the charge of the defendant, was a misdemeanor prohibited by the statute, and not cognisable in chancery, and that the conviction and imprisonment were for that offence, and not for a contempt of the court.

The attachment recites a previous order of the court, in which it was declared, that the defendant, during the time that he was a master, filed a bill in the name of one of the solicitors, and had acted as solicitor in the prosecution of the bill, in the name of the person, " contrary to the statute in that case made and provided, in wilful violation of his duty as master, and in contempt of the authority of the court." Here is a plain and specific statement of the cause of the commitment, and I feel no difficulty in saying, that it was a palpable case of contempt, of which the court had jurisdiction. That the court meant to proceed on the ground of the contempt, appears from the charge in the order, which amounts to a conviction for a contempt, and from the subsequent part of the order, directing the prisoner to be committed, " for his said mal-practice and con-

tempt." I cannot perceive, in this order, any colour for the inference, that the court of chancery assumed a criminal jurisdiction, distinct from the jurisdiction which that court has over contempts. Why should the court have done it? The offence was, in itself, a contempt of that court. This point cannot well be controverted. For an officer in chancery to practise as a solicitor, in the name of another solicitor, was mal-practice and contempt; and to do it without the knowledge or consent of such other solicitor, was a more aggravated mal-practice and contempt, for it was a gross fraud. The order does, indeed, go on to say, that such conduct was " contrary to the statute in that case made and provided, and in wilful violation of his duty as master." And are those words to warrant the inference, that the court intended to depart from the exercise of its undoubted jurisdiction in the case of contempts, when it had a contempt fully before it, and to usurp the criminal jurisdiction of a court of law? Is such a conclusion necessary, or even tolerable, when resting on such grounds, and applied to such a court? The inference would be very severe, and one which I could never indulge, even if the order stopped there. But when we connect this paragraph with the words which follow, " and in contempt of the authority of this court," and when we add the order thereon, that the party be committed, " for such mal-practice and contempt," the intention of the court appears to me to be manifest.

The statute, which the court is supposed to have alluded to, is the act entitled " *an act concerning counsellors, attorneys, and solicitors,*" which declares, that no master in chancery, shall act as solicitor in any action or matter in that court. A violation of this prohibition, by a master, may possibly be indictable, on the ground that every contempt of a statute is indictable, if no other punishment be prescribed. But an offence against this statute, may also be a contempt of the court, though in-

dictable; and the court may punish the contempt. A great part of the contempts which may be committed against a court of justice, are indictable offences; such, for instance, as assaults committed in the presence of the court, resistance to its process, and libels upon the court or its suitors, in respect to matters pending before it. Because the offence is indictable, that circumstance does not, in any case, destroy the right of the court to proceed against the party for the contempt, provided the act complained of amounts to a contempt.

One *Habin* acted as an attorney in the K. B. in the name of a regular attorney of the court, without the authority of such attorney, and the court granted an attachment against him. (1 *Burr.* 20.) Yet *Habin* seems to have been as liable to indictment for that conduct, as the present defendant; for the statute of 2 G. II. c. 23. s. 1. which was then in force, had declared, that no person should be permitted to act as attorney, until admitted and enrolled in the court. It was as much a contempt of the court of chancery, for the master to have acted as solicitor, after the prohibition in the statute, (admitting him to have been a solicitor before he was master,) as it would have been for any individual without admission, to have acted as solicitor. *The statute suspended the authority of the previous license,* so long as he continued a master of the court; and to act as solicitor, in defiance of the statute, was also acting against the will, and in contempt of the court.

Every illegal and unauthorised interference with the process or proceedings of a court, is clearly a contempt of such court, whether that illegality be created by statute, or be declared by the rules and practice of the court. This is a principle so well settled, as to become elementary. The court of chancery was therefore bound, in respect to its own character, and the rights of its suitors, to animadvert, as for a contempt, upon a master, or practising as solicitor, contrary to the statute; be-

cause, as far as relates to the punishment for contempts, a court of chancery is as much a court of criminal jurisdiction, as any court of law.

The case stated in the return, was not an ordinary violation of a statute, of which the courts of common law have exclusive cognisance. It was a violation which carried with it, of necessity, the commission of a contempt. It was a violation of a law *relative to proceedings and practice in chancery*, and committed, upon the records, and in the very heart of the court, by one of its officers. This gave the court cognisance of the case, as a contempt. The conduct of the prisoner, as set forth in the order, was a fraud, practised upon a suitor of this court, and it was an abuse by practice, which tended to injustice, deceit and oppression.

" The law," says serjeant *Hawkins*, (b. 2. c. 22. s. 2. and 12.) gives all courts of record a kind of discretionary power over all abuses, by their own officers, in the administration, or execution of justice, which bring a disgrace on the courts themselves, as not taking sufficient care to prevent them ;" and he says, that the court may proceed by attachment not only against attorneys, sheriffs, &c. but against any other officer of the court, for any act of disobedience or injustice, that concerns the practice of the court. Lord Ch. Baron *Comyns* lays it down generally, that " an attorney, being an officer of the court, if he attempts any thing which he cannot, or ought not to do, it will be a contempt of the court, for which an attachment shall go." (*Tit. Attorney*, B. 13.)

The mal-practice of officers, if frequent or unpunished, reflects dishonour on the administration of justice, and creates among the people a disgust against the courts themselves. This is the true ground of that salutary and indispensable discretion, with which the courts are invested, of controlling and punishing all kinds of abuse, and lawless practice, in every

ALBANY,
August, 1809.

Case of
J V. N Yates.

officer belonging to their jurisdiction. If we were then to admit, as the counsel for the prisoner contended, that the prisoner was attached for violating the statute, I should be of opinion, that the attachment was proper, for the statute could not be violated, without involving in the breach of it, a contempt of the court, any more than a breach of the peace can be committed, in the presence of a court, without including in the commission of it, a contempt of such court.

But it is clear, from the facts stated in the order, that the court of chancery did not convict the prisoner of a contempt on the principal point, that being master, he had acted as solicitor. If that had been the ground of the contempt, much of the detail in the order would have been omitted, as superfluous. The averment, that while he was master he had acted as solicitor, by filing the bill, would have been sufficient. But an offence, certainly not within the statute, is set forth, and that is subscribing the name of *Peter W. Yates* to the bill, without his knowledge or consent, and carrying on the cause in the name of *P. W. Yates.* This is the strong and prominent *gravamen* set forth in the order, and it is a grievance and contempt, which the statute did not reach. It was essential to the dignity of the court, and to the purity and regularity of its practice, that such conduct should be noticed and punished. The animadversion was indispensable.

I have hitherto considered the objection on the supposition, that the act of the prisoner did really amount to an indictable offence under the statute. The counsel argued the case on this assumption, and, indeed, without it, the objection which I have been considering, would at once fall to the ground. But I wish here to be understood, as not giving any decided opinion on this point. It will be time enough, when the question shall necessarily

call for an opinion. The words of the statute are, that no *master shall act as solicitor* in any action; and strictly speaking, the prisoner did not act as solicitor, but he acted as agent for, and in the name of another solicitor. The statute had reference to acts done directly by a master, in his own name as solicitor, and this intention is made evident by a recurrence to the act of the 20th *February*, 1787, where this prohibition is first to be found. The act intended to render that practice unlawful, which was lawful before. Practising in the name of another solicitor, was always mal-practice, and punished as such by the courts. It is a fraud practised both upon the solicitor and the court, and there is no need of a statute prohibition. If such conduct was within one of the mischiefs that the statute had in view, the power of the courts was adequate to meet and redress it. If the statute does in fact reach this case, it is so far a declaratory provision, and perfectly useless.

But if this court is to review the legality of the conviction in chancery, we ought, at least, to give the language of it a sound and liberal interpretation, and every reasonable intendment should be made in support of the jurisdiction of that court. This has grown into a settled maxim. In *Bethell's* case, (1 *Salk.* 348.) lord *Holt* and the other judges agreed, that the return was not regular or formal, but as it appeared that the prisoner was committed by a court having jurisdiction of the matter, he was remanded. Serjeant *Hawkins* (*B.* 2. c. 15. s. 73. 76.) lays it down as a general rule, that whenever the contrary does not plainly and expressly appear, it shall be presumed that the commitment was legal; and he adds, that the superior courts pay the highest regard to one another's proceedings, and will presume them to be agreeable to law, unless the contrary appear, or the case be very extraordinary. We are then bound to say, that if a competent authority be shown, no

words of equivocal import in drawing up the order, can
or ought to affect it. To set aside the conviction, as
*coram non judice,* because the order declares the act of
the prisoner to be against the statute, and his duty as
master, as well as in contempt of the court, would be to
adopt a construction rigorous beyond example. *Utile
per inutile non vitiatur.* In the case of *Huggonson,* a
printer, (2 *Atk.* 469.) who was adjudged by lord *Hard-
wicke,* guilty of a contempt in publishing a defamatory
libel upon certain persons who had made affidavits in
chancery, the lord chancellor takes great pains to prove
the paper a defamatory libel, or in other words, an in-
dictable offence, and he concludes with declaring it also
a contempt of his court, for which the party was com-
mitted, according to the common order of the court in
such cases. I believe it was never supposed that lord
*Hardwicke* usurped jurisdiction, and that his commit-
ment was void, because he showed a paper to be a libel,
as well as a contempt. Those words were thrown in, to
denote the aggravation of the case, but the exercise of
the power of the court was justly applied to the con-
tempt, and not to the libel.

As to the manner of drawing up orders in chancery,
his lordship observed, in the case of *Baker* v. *Hart,*
(2 *Atk.* 489.) that he wished the orders of his court were
framed with the same simplicity, as orders made by the
courts of law. They usually contain a recital of the
principal facts ; and this habitual want of precision, in
chancery orders, may account for some superfluous ex-
pressions in the present case, though the order of com-
mitment for " mal-practice and contempt," was agreea-
ble to the usual course. The word *mal-practice* is an ap-
propriate term for a contempt committed by an attorney
or solicitor, in abusing the practice of the court ; and the
most that can be said of the order before us, is, that it uses
two words of synonymous import, to express the same idea.

The return then shows, evidently, that the proceed‑ ing and commitment in chancery, was for a contempt; and on this subject it may be useful to look into the *English* decisions.

Several cases arose in the time of *James* I. in which the court of K. B. discharged persons upon *habeas corpus*, who were committed by the court of chancery for contempts. In the cases of *Astwick* and *Apsley*, (*Moore*, 839, 840. 1 *Roll. Rep.* 192.) the cause and particulars of the contempt were not set forth, so as to enable the court of K. B. to exercise its *assumed* power, to judge of the sufficiency of the contempt, and this is said to have been the reason for the discharge in those cases. And therefore, in *Allen's* case, (*Moore,* 840.) as the cause of the contempt was given, viz. in not performing a certain decree, therein made, the prisoner was remanded. But even this did not satisfy in *Glanville's* case, (*Moore*, 838. 3 *Bulst.* 301. *Cro. Jac.* 343.) for there it appeared, by the return, that he was committed by the court of chancery, for breach of a decree, and yet he was discharged by the court of K. B. which held the decree illegal ; and this decision led to an open struggle, between those courts for jurisdiction; for *Glanville* was afterwards committed by the court of chancery, for the same cause, and *again delivered by the* court of K. B.

Respecting the authority of these cases, Serjeant *Haw‑ kins* (*B.* 2. c. 15. s. 76.) remarks, that as to the court of K. B. bailing persons, committed by the court of chancery, little is said in the books, except in the reign of *James* I. when lord *Coke*, was Ch. J. and when there was great heat and contest between those courts, and several persons com‑ mitted by chancery, were bailed by the K. B. But he adds that he had not met with any late precedent of the kind, and he intimates, that the long disuse of such proceedings had lessened the authority of those cases. In another place (2 *Bl. Rep.* 757.) they are called hasty decisions.

They arose out of a violent contest, concerning which it has been uniformly admitted, that the court of K. B. was wrong; and that lord *Coke's* conduct, was not only erroneous, but intemperate. Those cases ought not, therefore, to be cited, as precedents, and especially since they are counteracted by the whole current of subsequent decisions.

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

In the very next reign, we find the court adopting different principles, and pursuing a more moderate course of conduct, and one more consistent with the privileges of other courts. This appears from *Chambers's* case, (*Cro. Car.* 168.) who was committed by the star chamber, for a contempt, and upon being brought into the K. B. on *habeas corpus*, he was remanded, and the court said, that " it was not the usage of that court, to deliver one committed by the decree of one of the courts of justice." In a subsequent case, in that reign, (*Cro. Car.* 579,) one *J. S.* who had been committed by the exchequer, for not paying a fine, was brought up by *habeas corpus*, and remanded, " because the commitment was by a judicial court."

In the case of the *earl of Shaftsbury*, (2 *St. Tri.* 615. 1 *Mod.* 144.) who was imprisoned by the house of lords, for " high contempts committed against it," and brought into the K. B. the court held that they had no authority to judge of the contempt, and remanded the prisoner. The court in that case, seem to have laid down a principle from which they never have departed, and which is essential to the due administration of justice. This principle, that every court, at least of the superior kind, in which great confidence is placed, must be *the sole judge*, in the last resort, of contempts arising therein, is more explicitly defined, and more emphatically enforced, in the two subsequent cases of the *Queen* v. *Paty and others*, and of *the King* v. *Crosby*. In the first of those cases (2 Ld. *Raym.* 1105.) the majority of the court determined, that they had no jurisdiction over the case of

a contempt adjudged in the house of commons, and they said that warrants of commitment, for a contempt both in chancery and the K. B. were short, without specifying particulars, and yet such warrants were suffered, for there was a difference between a commitment for a crime, and for a contempt.

In *Crosby's* case, (3 *Wils.* 188.  2 *Bl. Rep.* 754.) the language of the judges is singularly impressive.  He was committed by the house of commons, for a breach of privilege, and brought up on *habeas corpus.*  The point strictly before the court, and decided, was the same as in the preceding case, but the subject unavoidably led the judges into the consideration of adjudications for contempts committed in the courts of justice.  Their clear exposition of the law, on this head, did not partake of the nature of *obiter dicta,* but they were solemn and deliberate opinions of the whole court, two of the judges of which have, perhaps, never been surpassed in their distinguished reputation for talents and learning.  Lord Ch. J. *De Grey* observed that " when the house of commons adjudge any thing to be a contempt, or a breach of privilege, their adjudication was a conviction, and their commitment in consequence, was execution ; and that no court could discharge, or bail a person that was in execution, by the judgment of any other court."  " It was not the practice of the courts in ordinary cases, to take cognisance of such executions, or of commitments of that kind, and there was no precedent of *Westminster Hall* interfering in such a case.  That it was held in a case in the *Year Books,* that every court should determine of the privilege of that court.  That if the court of C. B. should commit a person for a contempt, the court of K. B. would not inquire into the legality or particular cause of commitment, if a contempt was returned, for in this respect, the courts were co-ordinate.  That the courts of K. B. and C. B. never discharged any person

committed for contempt, in not answering in the court of chancery, if the return was for a contempt. That if the court of chancery, or the admiralty court, commit for a contempt, no other court discharges the persons committed. That in Ch. J. *Wilmot's* time, a person was brought by *habeas corpus* into C. B. who had been committed by the court of chancery of *Durham*, and that court being competent, and having jurisdiction, the man was remanded. That perhaps a contempt in the house of commons, in the chancery, in the C. B. and in the court of *Durham*, might be very different; and therefore every court must be sole judge of its own contempts. That if the C. B. could determine upon the contempts of any other court, so might the other courts of *Westminster Hall;* and what confusion would then ensue? Abuses may be made for which there is no remedy, but this was unavoidable; and it was better to leave some courts to the obligation of their oaths. That in the case of a commitment by the K. B. or C. B. there was no appeal. That if the courts should abuse their jurisdiction, it would be a public grievance, and redress must be sought from the legislature. That if the two houses of parliament also, as well as the courts of law, should abuse the powers which the constitution has given them, it would be a public grievance. That the constitution had provided checks, to prevent its happening; it must be left at large; it was wise to leave it at large: some persons, some courts, must be trusted with discretionary powers; and though it is possible, it was in the highest degree improbable that such abuses should ever happen."

Mr. justice *Blackstone* pursued the same train of observation, and declared that all courts, by which he meant to include the two houses of parliament, and the courts of *Westminster Hall*, could have no control in matters of contempt. That the sole adjudication of contempts, and the punishments thereof belonged exclusive-

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

ly, and without interfering, to each respective court. That infinite confusion and disorder would follow if every court of the *hall* should have power to examine the commitments of the other courts, for contempts. That the judgment and commitment of each respective court, as to contempts, must be final, and without control. It was a confidence that might, with perfect safety, be reposed in the judges, and the houses of parliament. That the objection as to abusive consequences, proved too much, because it was applicable to all courts of *dernier resort*, and general convenience must always outweigh partial inconvenience.

I have cited the opinions of these judges much at large, because I could not hope to improve upon the strength of their observations ; and I entertain the most perfect conviction, that the law, as they declared it in this case, was well understood, and definitively established, as part of the common law of *England*, at the time of our revolution. Mr. justice *Grose*, many years afterwards, (8 *Term Rep.* 335.) thought he did enough to prove the settlement of the law on this subject, by merely quoting this very able decision of lord Ch. J. *De Grey*.

2. But admitting that the prisoner was committed for a contempt, his counsel have contended that the conviction was bad, because it was not founded upon sufficient evidence, as it is not stated in the order, that the prisoner was examined upon interrogatories.

It does not appear upon the return, whether the prisoner was, or was not examined upon interrogatories. The order is silent as to that fact, and it is by inference only that the counsel can draw such a conclusion from the return. Assuming that the prisoner was not examined, and that this court was authorised to review the proceeding, I am not prepared to say that such an examination was indispensable. This would depend upon the usage and practice of the court, and it must rest upon

sound discretion, in each particular case; for it is a settled rule in chancery, that if the defendant be examined on oath, touching a contempt, his denial is not conclusive, and the court will examine witnesses on both sides, and decide according to the weight of testimony. There is then no reason that the party charged in chancery with a contempt, should be entitled to claim as a matter of right, to purge himself upon oath, because such purgation is no acquittal, as it is at law. (4 *Bl. Com.* 284. *Doug.* 516.) But it is a decisive answer to this objection, that we have no authority to inquire upon this return into the proceedings in chancery, prior to the conviction. It is enough for us, that we see, on the face of the return, an adjudication or conviction for a contempt, and a commitment in pursuance of such conviction. By what means the court of chancery arrived to the adjudication, we are not to inquire, for this court is not intrusted by the constitution, with the power of sustaining appeals from chancery. We can only act judicially upon the facts appearing upon the return. We have not the proceedings and evidence before us; and to sit here in judgment upon them, with only *ex parte* suggestions and arguments to guide us, would be extravagant. I disclaim any such power. We are bound to presume, that the prosecution for the contempt down to the conviction, was duly conducted; and I entertain a persuasion, from the character of the court, that if all the facts were fairly before us, they would demonstrate the moderation and regularity of the proceedings. It is sufficient for us here, that we see by the return, a conviction for a contempt, and a commitment by a court of competent authority.

3. The last objection taken to the sufficiency of the return is, that the prisoner was committed until the further order of the court.

It was admitted that this is the usual form of the or-
der of commitment for a contempt in chancery, as well
as in the courts of common law.  If we are all in an
error, upon this point, it is time that the practice was re-
vised ; but it would ill become this court, to discharge
the prisoner, by reason of an exception which applies
equally to the practice of this court, and which has been
established in all the *English* courts, and in the two
houses of parliament, from almost time immemorial.

The counsel for the prisoner traced the chancery prac-
tice, as laid down in the *Practical Register*, and in
*West's Symbolography*, back to the period of the *Year
Books*, to show that it had no foundation there.  But it
would be extremely unwise to overset an established
practice, and course of precedents, because such a re-
mote origin cannot be shown.  Our most valuable insti-
tutions could not endure so severe a test.  The forms
of administering justice, in all their practical details,
have undergone essential changes, and vast improve-
ments.  The time of the *Year Books* was, even at *West-
minster Hall*, a time of comparative ignorance, and bar-
barism ; and if precedents from that infant period of
our law, were admitted to control the cultivated ju-
risprudence of the present day, they would degrade, or
at least tarnish the character which it now enjoys, in the
maturity of its age, and the height of its prosperity.

The practice of commitments for contempts, during
pleasure, prevails in the house of assembly of this state,
(*Colony Journals*, v. 2. 510. and *State Journals for*
1796,) as well as in the house of commons in *Great Bri-
tain.*  It has become too deep-rooted and inveterate a
practice for us now to correct ; and I am persuaded
that there exist sound reasons for the universal adop-
tion of it, and that it has not been found, upon expe-
rience, to be injurious to the liberty of the subject.  The
objection is, *at this time*, new.  It was taken in the *earl of*

ALBANY,
August, 1809.

Case of
J. V. N. Yates.

*Shaftsbury's* case, and also in that of *The Queen* v. *Paty and others ;* but in the latter case, though Ch. J. *Holt* objected to the sufficiency of the return, he took no notice of this objection; and Mr. Justice *Powys* said that a commitment during the pleasure of the house, was more favourable to the prisoner, and more for his benefit, than a commitment for a certain time, as it leaves to the house a power to discharge the prisoner upon his submission. He said that it was agreeable to the constant forms of commitment by the commons ; and was conformable to the commitments by the K. B. which are implied to be during the pleasure of the court. (2 Ld. *Raym.* 1108.)

If the time should be definite in the sentence, the court could not alter it, even upon the submission of the party; and it would operate rigorously upon him. The courts would feel obliged to commit for a time adequate to make due reparation for the contempt, without any submission. It is the established course, in the courts of law and equity, and in the legislature, to receive the submission of the party, whenever he is ready to offer it, and on reasonable satisfaction made, to discharge him. The party offending ought to submit, and the form of the order is the most effectual way to ensure it. There is no such thing as an abuse of this power in modern times. The case probably is not to be found. An alarm cannot be excited at its existence, in the extent now laid down. It is given to the courts, only for their preservation, in order to enable them to repel insults, to protect suitors, to support their process, and to be an asylum from violence and oppression.

The judicial is, from its very constitution, the feeblest department in government. " *Des trois puissances,*" says *Montesquieu,* " *dont nous avons parlé, celle de juger est en quelque facon nulle.*" (*L'Esprit des Loix, liv.* 11. c. 6.) It is so checked, and so controlled, that it cannot essentially abuse its powers. The tendency of the times, is rather to induce the courts to relax, than increase in the

severity of their ancient discipline, to exercise their power over contempts with extreme moderation, and never to resort to it, but when urged by the most commanding necessity. Sound discretion must use, and apply the power we have been considering, and sound discretion is and must be confided to the highest tribunals, on this subject. The trust is given to the courts, not for themselves, but for the public, who are deeply interested in the preservation of this power, in its accustomed vigour.

I am accordingly of opinion that the prisoner must be remanded.

VAN NESS, J. and THOMPSON, J. were of the same opinion.

*The Court*, thereupon, made the following order :

*Ordered*, that the said *John V. N. Yates* be remitted to the custody of the sheriff, of the city and county of *Albany*, to remain in the same state in which he was, at the time of the issuing of the said writ of *habeas corpus*.

<p align="right">Motion denied.(<i>a</i>)</p>

(<i>a</i>) The prisoner having been bailed to appear at this term, he was called, and not appearing, his recognisance was ordered to be estreated.