# REPORTS

OF

# CRIMINAL LAW CASES.

## Supreme Court.

## NASHVILLE, (TENNESSEE.)

*Decision in the case of P. H. Darby.*

NASHVILLE, 1824.

If an attorney write and publish strictures on an opinion delivered in court, with a view to prejudice a cause pending in such court, or the court to which it may be remanded for trial, such publishing is a contempt, for which he may be stricken from the roll of attorneys.

The judgment of the court to which the contempt is offered is final; and though the proceedings be summary, is no infringement of the 11th section of the Bill of Rights.

The power of courts to punish for contempts by summary judgment, existed before, and since, Magna Charta, from which the said section in our Bill of Rights is copied; consequently subject to like constructions.

Under the act of 1815, ch. 95. the supreme court can silence and disqualify an attorney; and he can be restored no otherwise than by such court revoking the sentence.

A license subsequently procured from circuit judges pending the judgment of disqualification, is a void license.

The grant of it being in effect a reversal of the judgment of a superior tribunal, was illegal, and it will not be allowed inferior tribunals to do by circuity what they cannot do directly.

HAYWOOD, J. delivered the joint opinion of himself and PECK, J.

Darby having on the second day of this term been stricken from the roll of attorneys, for a publication

in print respecting a suit still pending in the cir-
cuit court for the county of Anderson, in which the
opinion of the supreme court had been given at Knox-
ville, for the purpose of forestalling the public opinion
upon the merits thereof, and to excite public indigna-
tion against the judges for giving that opinion, and to
bring the same into contempt, has, since that time, as
he says, obtained a certificate from the county court of
Davidson, and has obtained a new license from Thomas
Stewart and Robert Mack two of the judges of the cir-
cuit courts; and he, by virtue thereof, has applied to
this court to be again admitted to practise as an attor-
ney in this court. As judge Whyte was a judge of this
court who was not implicated in this or in any other
publication made against the judges, the other two judges
of this court have been desirous that he should act upon
this motion, as no feeling unfavorable to the applicant
could be possibly supposed to intermix in any judgment
which he might form. But as that desire has been
hitherto disappointed, the t o remaining judges of the
court will now proceed to give their sentiments upon
this application. It is indeed a novel application, as
was the other day mentioned, but it is not one concern-
ing which the court can be under any embarrassment.
For whether we consider of the power of the court to
punish for a contempt, or of punishing an attorney by
striking him from the rolls; or of the constitutionality
of this power; or of its being a part of the criminal
jurisdiction or otherwise; or of the rights which other
courts or judges have to pardon, release or defeat, the
punishment ordered, either directly or indirectly; it will
be discovered, that with respect to any of these articles
there is not any serious difficulty.

The power to punish for contempts is so indispensa- ble to the preservation of the authority of the courts of judicature, and to both branches of the legislature, that it has been considered by general consent conceded to them, from times of the highest antiquity to this day. In 4 Bl. p. 282, 283, 284. 288. specifying the contempts for which the court may punish in a summary way, he enumerates, among others, that by speaking or writing contemptuously of the court or judges, acting in their judicial capacities, by printing false accounts, or even true ones, without proper permission, of causes then depending in judgment; and by any thing, in short, which demonstrates a gross want of that regard and re-spect, which, when once courts of justice are deprived of their authority, is entirely lost amongst the people. And to this may be added, Hawk. P. C. b. 2. ch. 22. sec. 21.; Bac. Abr. At. a. 1.; Com. Dig. At. a. 1.; 4 Johns. 328.; 5 Johns. 289.; 9 Johns. 398. 416.; 14 East, 84, 85. 95. 100, 101.; Wilmot's Reports, 243. 254.; 1 Wilson, 299.; 3 Wilson, 188, 189.; 2 Bl. Rep. 758.; 2 Atk. 471. What would be the consequence, if courts of judicature had not this power? Every such publication is intended to have the effect of beating down the pretensions of one party, and of establishing the claims of the other upon their ruins. Otherwise the publication has no object at all. If an artful writer may villify and abuse the one party, and make his cause odious, the effect is by forestalling and prejudicing the public mind, to make the jurors favor one side against the other, and to deter the judges from a candid and fair expression of their sentiments, and by means of ter-ror to procure judgment against the abused adversary, whatever may be the merits of his cause, and whether

law and justice be on his side or not. The plain and simple man, when sued, is no otherwise able to defend himself than by looking to the judge to give him the law which the legislature has provided for his security. But how can he obtain this benefit, after his more able adversary has made the world believe that he is a villain; has blackened his cause in public estimation; has turned the current of popular prejudice against him; has preoccupied the opinions of the jurors, and has so intimidated the judges who are to decide in his cause, as to make them afraid to give judgment in his favor, however meritorious his cause may be. If such practices must be tolerated, what chance has the weak man against the strong? the poor man against the rich? the man without friends and influence, against him who has both? The law is made dumb, the judges dare not pronounce it, and the daring and factious lay their rapacious hands upon such property of the people as they choose to fancy. They have no more to do but to sue for it, to traduce the possessor, to terrify the judge, and to sit down and divide the spoil with their friends. No man who had a good cause ever took such a course: he has no need of calumny, nor of public prepossessions, to hold up his cause; he confidently trusts to the unbiassed judgment of the court, and to its own intrinsic recommendations. If such practices must be tolerated, what is the law but an engine, by the help of which the cunning man overreaches and ruins his unlearned neighbor? and by what tenure do the people hold their possessions, but at the will and pleasure of those who, by their publications, acquire over the public functionaries a destructive ascendancy? Can a judge whose mind is enslaved by fear, do justice against the tyrant who en-

slaves him? Can he apply the maxims of jurisprudence NASHVILLE 1824 for the protection of a defenceless adversary; a help-less citizen, who has no friends or factious partizans to back him; who has no wealth, or family, or fame, to sustain him?

If the court had not such power, the laws could not be executed, and the government itself would be pros-trated. But how is this power to be exercised? I an-swer, by fine and imprisonment, when it is proper; and by striking the name of an attorney from the rolls when it is more proper. Attorneys, for misbehaviour, have been stricken from the rolls in a summary way, from the earliest periods of our judicial history to this day. Instances may be seen by reference to the Year Books of H. 6. pl. 37.; Moore's Rpls. 882.; 30 Eliz. Osbaston's case; Cro. Ch. 74.; Stiles's. Prac. Reg. 12.; 6 Mod. 187.; 2 Atkins, 17 ?.; 2 Inst. 214, 215.; Cowp. 829. In 1 Vent. 331. for contemptuous words in court, an attorney was suspended from practice, or stricken from the rolls, which, in 2 Bl. Rep. 222. is explained to be, till the court shall think proper to restore him. 6 East, 143. The same power is confirmed by the act of 1815, ch. 95. and 1817, ch. 135. the effects of which acts will presently be examined.

*See Vol. 2. Burr's Case, and Vol 1. title Attorneys.*

This power, so far from being repugnant to the words or spirit of our constitution, is, on the contrary, a part of that law of the land which is recognized. The 29th article of Magna Charta, which says, as our own Bill of Rights does, art. 11. sec. 8., " That no freeman shall be taken or imprisoned, or disseized of his freehold liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of life, liberty, or property, but by the judgment of his peers, or the law of the land,"

NASHVILLE has been interpreted under the term " law of the land,"
1824.
to include the power in courts of judicature and in both
branches of the legislature to punish for contempts. 4
Inst. 23. ; Sullivan's Lectures, 494. ; 1 Dallas, Oswold's
case; 14 East, 85. That it is a part of the law of the
land, is proved by its constant exercise by all our courts
of judicature, and by both houses of the legislature when
necessary. This power the house of commons of North-
Carolina exercised in the year 1777, a few months only
after the formation of the constitution, in the case of
William Blount, who made an assault on Mr. Nash, the
speaker of that house.

The power to punish for contempts is no part of the
criminal law. If it were, courts which had no criminal
jurisdiction could not punish for contempts, as the houses
of the legislature, the court of chancery, and this court.
Where the contempt amounts to an indictable offence as
well as a contempt of the court, punishment inflicted by
the latter is no bar to a prosecution for the former, and
vice versa. And neither the contemned court, nor the
court of criminal jurisdiction, is obliged to suspend pro-
ceedings till the other has acted. 9 Johns, 413. 417. ;
Cowp. 829.

This power itself, from its very nature, must necessa-
rily be independent of all other tribunals. For if it de-
pends upon another, whether punishment can be inflict-
ed or not, that very dependence defeats and overturns it.
The insulted judge must go to law before some other
tribunal, with every one whom his decisions offend.
He must quit his business in court, and leave the bench,
and travel to inferior courts, and give his attendence up-
on them, neglecting in the mean time the official duties
which belong to his office. The inferior judge may not

be disposed to discourage the contempt; the proceedings may not be regular or legal; they may in the end be set aside and quashed, by arresting or reversing the judgment, and must be commenced again, and the same difficulties again encountered. No one would be afraid to offend: the delay of punishment, and the numerous chances of escaping it, would disarm the expected punishment of all its terrors. Nor would the insulted court ever think of the attempt to cause the infliction of punishment under so many discouragements. No sooner does he get through one set of controversies, than some other dissatisfied suitor assails him with equal outrage, and involves him in others. He must go again and forever through the same routine of vexation and trouble. With such embarrassments to contend with, will he remain upon the bench? He must either quit it, or submit to be directed by men who resort to such means for the attainment of their ends, and become an instrument in their hands for the sake of rest, abandoning his duties and resigning the rights of the people. Without power to repress the efforts of designing men, that shall be directed against him because of an unyielding temper, how will the judge be able to uphold his integrity when interests of the highest magnitude are to be settled by his decisions? When it shall be observed that the most submissive pass unmolested, will not submission at least plead in recommendation of itself? Will it not set before him the perpetual conflicts which he has to maintain in vindication of opinions in which he has no individual interest, and the unceasing calumnies to which he is exposed for the protection of others, who hardly know the cause why he is so worried? If in so many difficulties the judge is not furnished with the means of imme-.

diate defence and repression, his authority must fall, and
the rights of the people with it. For what rights have
they but those which the law gives, by means of the
courts it has instituted ? And if these cannot support
them, the rights themselves are nominal. The authori-
ty which courts have to punish for contempts cannot
therefore be interfered with in any degree by any other
court or judge. If the party be committed, and brought
before another judge or tribunal by *habeas corpus*, and
it appear upon the face of the commitment that he was
committed for a contempt, that being a matter not cog-
nizable in any other but the committing court, he will
therefore, without further inquiry, be remanded. Cro.
Ch. 168. ; 2 Bl. Rep. 757. ; Dyer, 59. b. ; Cro. Ch.
579. ; L. Ray. 1108 ; 2 Bay's Rep. 183. ; 1 Dall. Rep.
319. ; 5 Johns. 289. ; 9 Johns. 419. 421. 423. Nor can
the sentence be suspended by writ of error. Bibb's
Reports, 602. Johnston's case, and the decision of this
court at the present term in the case of The State v.
Shumate ; also 14 East, 84, 85. 95. 100, 101 ; 3 Wils.
200, 201, 202, 203, 204. All these conlusions are es-
tablished by repeated decisions in different ages through
a long succession of centuries ; are indispensable to the
existence of courts of judicature ; have never been
complained of, or restrained or regulated in any consti-
tution or national instrument produced by the struggles
of the people against oppression ; but on the contrary,
has been considered as a power in support of the courts
of judicature ; upon which they depended for protec-
tion, against the usurpations of prerogative, and there-
fore was considered as a privilege belonging to the peo-
ple. And when these evidences are properly under-
stood, they furnish an answer to the principal questions
which can arise in this application.

If no judge or other tribunal can interfere to defeat a sentence given for a contempt, shall it be allowed to judges of the circuit court, by circuity, to defeat a sentence through the medium of a new license, which, by any direct means, they were not allowed to defeat? They have power to give license to practice as an attorney by the act of 1809, ch. 6. But by the act of 1815, ch. 97. sec. 2., "If the judge, upon an investigation into a charge alleged against an attorney, should be of opinion that he is guilty of a misdemeanor which ought to disqualify him from practising as an attorney, it shall be the duty of such judge to strike his name from the rolls; and it shall not be lawful for any attorney, so disgraced, to practice as such in any court of record in this state." If, by the act of 1809, he has power to grant license, does that extend to grant license to one who by law is disqualified to practice? If they have power to grant license to one who is certified by the county court to be a person of good moral character, does this authorize them to grant license to one who on record of the highest court is stricken from the rolls because of his misbehaviour? Does it give them power, in the face of a conviction of misbehaviour standing on record, to reverse the conviction, or to release from the punishment which is in consequence of it, unless they have power to pardon the conviction, to relieve from punishment, to discharge the order for repealing the license, that yet stands upon the record a bar to their proceeding to any act which can indirectly have that effect? For either the entry on record must have its effect, or the license which they have given must be of no effect. They are repugnant to each other, and one or the other must give way. The judges of the circuit court have no power by the common law, or by any sta

NASHVILLE
1824.

tute, to give license to a removed attorney who has been stricken from the rolls for misbehaviour. As the power given to them by the act of 1809 must be in accordance with the act of 1815, and not repugnant to, or subversive of it; therefore they have no power so to use their authority as to defeat a sentence given under the act of 1815, and to render the same void, and of no effect. The act of 1817, ch. 61. sec. 3. also gives the like power of removal, and at least is not to be made void by the prior act of 1809, but must be deemed restrictive of that act so far as any thing done under it would directly operate against the provisions of the act of 1817. In short, the act of 1809 must not be made to undo and defeat that which is legally done under the act of 1817. The act of 1817 says, that the judges of the court of errors and appeals shall have power to silence any practising attorney, upon the due proof that such practising attorney has been guilty of any of the offences mentioned in that act, or that such practising attorney is guilty of such other acts of immorality or impropriety as are inconsistent with the character or faithful discharge of that office. Was it the meaning of the legislature, that when discharged by the judges of the supreme court, the judges of the circuit court should restore him the next day in face of the record made by the judges of the supreme court, and in opposition to, and in defeasance of what they have lawfully done in pursuance of the act of of 1817? Their power and conduct under the law of 1809 must be in accordance with that which is legally done under the act of 1817, and not in subversion of it. And hence it follows, that a new license, the effect of which, if valid, will be to restore to the practice from which he is removed, leaving the conviction against him

, on record in full force, is one given without authority in the judges of the circuit court to give the same, and is therefore utterly void and of no effect; of course, it can give him no right to be again admitted to practise in any court from which he was debarred to practice by the sentence of conviction given against him by the supreme court; and that he has no other means of readmission but by a suspension of the sentence by the court which made it.

NASHVILLE
1824

Therefore, this application to be admitted under the new license, must be refused.